[Cite as *State v. Heckathorn*, 2019-Ohio-1086.]

# IN THE COURT OF APPEALS OF OHIO

## SEVENTH APPELLATE DISTRICT
## COLUMBIANA COUNTY

STATE OF OHIO,

Plaintiff-Appellee,

v.

DANIELLE L. HECKATHORN,

Defendant-Appellant.

---

**OPINION AND JUDGMENT ENTRY**
**Case No. 17 CO 0011**

---

Criminal Appeal from the
Court of Common Pleas of Columbiana County, Ohio
Case No. 15 CR 447

**BEFORE:**
Carol Ann Robb, Cheryl L. Waite, David A. D'Apolito, Judges.

---

**JUDGMENT:**
Affirmed and Remanded.

---

*Atty. Robert L. Herron*, Prosecuting Attorney, *Atty. Ryan P. Weikart*, Assistant Prosecuting Attorney, 105 South Market Street, Lisbon, Ohio 44432, for Plaintiff-Appellee and

*Atty. Katherine R. Ross-Kinzie*, Assistant State Public Defender, *Atty. Carly M. Edelstein*, Assistant State Public Defender, Office of the Ohio Public Defender, 250 East Broad Street—Suite 1400, Columbus, Ohio 43215, for Defendant-Appellant.

Dated:  March 25, 2019

---

**Robb, J.**

**{¶1}**   Defendant-Appellant Danielle L. Heckathorn appeals after being convicted of murder and other offenses in the Columbiana County Common Pleas Court.  She raises issues with:  sufficiency of the evidence to show she was complicit to murder; sufficiency of the evidence to support three counts of obstructing justice, claiming any false information she provided the officers was for the purpose of hindering their investigation of her rather than to hinder their case against another; admissibility of four photographs of the victim showing his body was cut in half; ineffective assistance of counsel for various reasons; cumulative error; and consecutive sentence findings.

**{¶2}**   For the following reasons, Appellant's convictions are affirmed, and the case is remanded for the trial court to issue a nunc pro tunc sentencing entry incorporating the consecutive sentence findings made at the sentencing hearing.

STATEMENT OF THE CASE

**{¶3}**   On Sunday, March 8, 2015, a distressed man appeared at the Columbiana County Sheriff's Department to report that his neighbor, Daniel Landsberger, confessed to killing a black male.  Landsberger said the body was still in the bedroom of his trailer packed in snow and he was thinking of cutting it up and burning the mattress.  The trailer was in a rural area with a steep, icy drive.  The deputies attempted to gather support personnel and four-wheel-drive vehicles, but they were not able to respond until the next day.

**{¶4}**   As a team from the sheriff's department approached Landsberger's trailer on March 9, he met them outside and provided consent to search.  (Tr. 285).  He had four scratches on the side of his neck that looked like fingernail scratches.  (Tr. 288-289).  The remains of a mattress and box spring were still smoldering in a fire pit in the yard.  (Tr. 287, 497).  In the trailer, officers discovered blood in a bedroom containing an empty bed frame, and the wall behind the bed had blood spatter in the shape of the headboard that

Case No. 17 CO 0011

was no longer present. (Tr. 286, 480, 487). Below this was a small area of carpet saturated with blood. (Tr. 484). Objects near the adjacent wall also had blood spatter. (Tr. 486). There was "cast-off" blood identified on the ceiling; a BCI investigator explained this blood was cast from a moving object after it was used to hit a bleeding body. (Tr. 481, 485, 582). The bedroom appeared to have recently been used as a "walk-in cooler" due to the lack of heat, open windows, six five-gallon buckets of melting snow, and a rolled towel under the door. (Tr. 286, 290-291, 479).

{¶5} In Landsberger's SUV, officers found a small area saturated with blood in the cargo hold. (Tr. 502). Smears of blood were discovered on both rear passenger lower door frames and the inside of the back hatch. (Tr. 504-506). While a dog warden was attempting to secure a dog, a bag of dog food in a shed was opened and found to contain bloody items such as bed sheets, plastic sheeting, a garbage bag, and clothing (with an open condom in the pocket). (Tr. 397-398, 514-520). Another condom and wrapper were recovered from the bedroom floor. (Tr. 491). No body or bloody weapon was discovered on the property.

{¶6} Officers searched for Landsberger's female friend whom they concluded was Appellant Danielle Heckathorn (fka Eckhart). She was interviewed on Tuesday, March 10, 2015, the day after Landsberger was arrested for tampering with evidence. She said: Landsberger picked her up on Thursday; he had a black male named "Q" (the victim) in his car; they went to certain places and then to Landsberger's trailer; she and Landsberger used cocaine that night which she believed the victim provided; the condom in the bedroom may have been hers but was not from that night; when they were taking her home, Landsberger stopped the car, told the victim to get out of the car, and proceeded to beat him; Appellant locked the door out of fear, but the two men returned acting friendly to each other; the victim got in the back seat bleeding from his nose; Landsberger had scratches on his neck; and Landsberger took Appellant home. (Tr. 776-786); (St.Ex. 27).

{¶7} When a detective expressed he did not believe her story, Appellant admitted she had intercourse with both Landsberger and the victim that night, stating her services constituted her payment for drugs. She said Landsberger "ripped" the victim out of the car and beat him up in order to rob him; she also said the victim lost the crack cocaine

during the fight, but they subsequently found it. (Tr. 788-789). She claimed the beating occurred at a pull-off for a recreation area, pointed out the area on a map, and said she could bring them to the location. She disclosed there was blood on the snow. (Tr. 803). She insisted the victim was awake when they dropped her off at home around 2:00 a.m. (Tr. 793).

{¶8} The detective received a photograph of Quinn Wilson after texting another officer to say Appellant mentioned a black male named Q. Appellant identified the photograph of the victim. (Tr. 749). She then announced that she had the victim's phone, stating she used it because her phone had no service. When asked if she deleted messages from the victim's phone, she assured the detective she deleted no messages from his phone. (Tr. 791). She said she did not speak to Landsberger after the incident. (Tr. 793).

{¶9} Appellant thereafter added a new part to her story; she said Landsberger instructed her to drive the car down the road during the beating. (Tr. 795). When confronted with her different versions of the story, she revealed the pertinence of text messages by claiming she thought Landsberger was joking when he texted her to say he would beat the victim up and "take his shit." (Tr. 797). She subsequently admitted going to Landsberger's residence a second time, after having sex in the bedroom but before the robbery; she said this time Landsberger walked down to get vinegar in order to prepare crack for injection while she and the victim waited in the car at the top of the icy drive. (Tr. 798).

{¶10} She said she deleted messages on her own phone (or her phone automatically deleted messages) when the memory became full. (Tr. 933-936). A detective brought Appellant to the recreation area so she could direct him to the pull-off where the incident allegedly occurred. (Tr. 948, 955). A search was conducted that day and the next day, but no evidence of an altercation was uncovered. (Tr. 370-371, 949).

{¶11} On Wednesday, March 11, 2015, a man who lived on a dirt road found the victim's body on a hill by the road. He reported seeing a loud blue truck on the road the previous evening; after he thought it passed from hearing-distance, he heard its engine start, making him suspect someone was dumping tires or a deer carcass as they had in the past. (Tr. 461-463). When he inspected the property the next day, he found the

bottom half of the body of a black male and then saw the top half of the body farther down the hill. (Tr. 463-464). This location was 1.7 miles from where Appellant resided and 8.8 miles from Landsberger's trailer. (Tr. 759-760).

**{¶12}** The medical examiner concluded someone cut the body in half at the waist after death, first using a sharp knife-like instrument and then cutting through the bones in the pelvic area with a saw. (Tr. 1005-1006). The victim suffered multiple (at least 19) chopping "blunt-force injuries" to the head with "features of sharp-force injury" caused by an instrument such as a hatchet. (Tr. 1012). The blows caused: a broken lower jaw on the left side; a left forehead injury; a base skull fracture which radiated from a hit on the top of the head; open skull fractures oozing brain tissue; seven overlapping blows to the right forehead and eye; blows to the right back of the head; crushed bones of the nose and cheeks; and a split maxilla caused by two chops to the upper lip. (Tr. 1012-1019). Death occurred within seconds to a few minutes after these blows. (Tr. 1022). The victim also suffered a fractured right forearm prior to death which was not caused by a sharp object (but could have been caused by the opposite side of the sharp-edged object). (Tr. 1007-1008). The medical examiner found no evidence of blows from a fist. (Tr. 1020).

**{¶13}** The blood evidence from Landsberger's property matched the victim's DNA. Appellant was a major contributor to the DNA on the condom from the bedroom floor. (Tr. 643). DNA on the condom from the pocket of the victim's sweatshirt was a mixture consistent with the victim, Landsberger, and Appellant. (Tr. 646).

**{¶14}** The police conducted the second interview of Appellant on April 24, 2015. She said she obtained the victim's phone at approximately 1:00 a.m. She claimed she listened to music on it, she tried to call a friend, and then it ran out of battery. She also explained she did not have sex with Landsberger that night as he could not obtain an erection; she had sex with the victim two times that night. (Tr. 808, 815). Appellant mentioned a conversation on robbing the victim they had in person before the texts on the subject. (Tr. 811). In describing the victim's condition after the robbery, she said he "was messed up" but not "terminal." (Tr. 813). She said Landsberger asked the victim if he wanted to go to the hospital.

**{¶15}** Ohio's BCI recovered data deleted from the victim's phone, including forty-four contacts between Appellant and the victim. (Tr. 701-702). The phones of Appellant

and Landsberger were not smartphones and were sent to the FBI for data extraction. The memory chip in Appellant's phone had many bad sectors which could no longer be read. (Tr. 691-692, 715). The recovered texts demonstrate these gaps in the data extraction. (Tr. 834, 861). Besides texts, the phones also showed calls between Appellant and the victim and between Appellant and Landsberger.

**{¶16}** On Wednesday, March 4, 2015, the victim sent the following text at 3:08 a.m. telling Appellant: "I need that 800 so come thru for me make sure have some Yes cash to or lease try the more the better." After communications took place that are now unrecoverable, Appellant told the victim: "And no u cant guarantee its what we need. Even if everyone u know loves it. Some of the best stuff to others is worthless to us." Ten minutes later, she said, "Lmk when u gonna have some for me to test so we can get the flo rollin if its good." A few hours later, the victim indicated he could obtain "man" or "boy" if she could provide a ride and money; a detective explained "man" or "boy" is heroin. The victim spoke of his plan to have sex while he was in town. He also asked her to use her connections to find him a place to operate. Appellant replied that she did not know a place for him but did speak of providing him a "business opportunity" in Lisbon once she tested his product.

**{¶17}** At 6:35 a.m., Appellant told the victim to "get like a 20 off every person u know that sell it. So we got better chance of findin the right stuff." (A "20" was said to be a portion of drugs.) While encouraging the victim to collect drugs for their next meeting, Appellant disparaged the victim to Landsberger, encouraging Landsberger to rob the victim. At 6:37 a.m., she texted Landsberger: "*Remember our robbery conversation yesterday?*" (Emphasis added.) Six minutes later, she told Landsberger: "*This nigger dumb as fuck and he walkin around w a bunch of shit bumming rides from ppl he don't know and rippin ppl off constantly. Hes ignorant, stupid, small, slow, and don't carry any weapons.*" (Emphasis added.)

**{¶18}** Over the next hour, Appellant told the victim to collect as many different kinds of "soft" that he could find "cuz soon as we find a winner we be getting major bank" and "once we find it u gonna be movin some serious weight." (A detective explained "soft" referred to cocaine and "hard" referred to crack.) There was an indication the victim wished to sell heroin and crack while Appellant was insisting on cocaine. Around 4:00

p.m., Appellant told the victim she was on the way to pick him up; other texts indicated a man drove them that evening.

**{¶19}** The next day, Thursday, March 5, 2015, Appellant asked the victim if he had gas money and said: "You still owe for yesterday. Idk if he gonna do it" and "he hasn't answered yet but he just got off work so give a min." Around this same time, Appellant texted Landsberger (at 3:33 p.m.) asking him to let her know when he finished work and stating, "That dude wants ride to ytown said hed make up for yesterday. *Should rob him lol.*" (Emphasis added.) At 6:07, Appellant texted Landsberger: "*He getting da hard on a front so he aint gonna be worth rippin til after ytown*" and "*Then we take him out in da country n leave him..lol.*" (Emphasis added.)

**{¶20}** Landsberger sent multiple texts voicing he was "thinking about that hate sex" and "thinking about that good hate sex." He sent the following additional texts to Appellant: "U want 2 make it fri thirteen"; "We beat emm tp"; and "Do u want him beat up?" Appellant's answers to these texts were not recovered.

**{¶21}** At 9:38 p.m., Appellant wrote a message which was saved as a draft, saying, "Its shootable." A message saved as a draft is not a sent message. A message can be saved as draft when a person starts typing but then: the person proceeds without hitting send; the phone is shut down; the phone runs out of battery; or the phone loses the signal. (Tr. 696-697).

**{¶22}** At 12:53 a.m. (now Friday, March 6, 2015), Appellant sent a text to Landsberger declaring: *"Pick a place beat him n take his shit."* At 1:00 a.m., she texted him explaining, *"There is no one. We going out there to take his shit n leave."* (Emphasis added.) At 1:07 a.m., she repeated, "We aren't meeting anyone..u know this right?"

**{¶23}** *On the victim's phone*, a text was saved as a draft at 1:20 a.m. which stated, "*Jkill.*" Appellant's statement admitted she had possession of the victim's phone at this time. At 1:27 a.m., the victim's phone sent a text to Landsberger with the following instructions: "*I dnt know u may have to do knock him out in here.*" (Emphasis added.) Appellant typed a message on her own phone, which was saved as a draft at 2:13 a.m., reading: "*U got a crow bar? Knock him out and drag him out of carLa.*" (Emphasis added.)

**{¶24}** Landsberger sent a text *to the victim's phone*: "Some dumb nigger salen his shit. I Think I might of fucked him up and took his stuff. Was it ok?" At 3:41, Appellant

used her phone to ask Landsberger, "Wat u do w him?" She also advised, "And u can smk it. Recook." Landsberger texted Appellant's phone: "He be at my place. dont k just yet what to" and then "This nigger stinks. Now I defenatily need to clean bed lin..he sleeping."

**{¶25}** Appellant texted Landsberger at 5:22 a.m. to say "*That def didn't go as plan," and minutes later, she added, "Evidently I do have conscience.*" (Emphasis added.) Landsberger sent texts to Appellant asking for encouragement and worrying he would "lose [her] over this." Appellant texted Landsberger about being sick from drugs, and Landsberger said he "got drunk last nite didn t get home till ten." He told her, "Need to deleat." Appellant responded, "Am now" at 12:11 p.m. on Friday. That day, they texted about Landsberger bringing more drugs to her house. He also texted, "No i ok not a violent man just wanted to be with u .sorry for asking. I dont k what ur gone through."

**{¶26}** On October 15, 2015, after receiving the information extracted from the three phones, the police conducted a third interview with Appellant. She said she had sex with the victim in the trailer and later in Landsberger's vehicle in his driveway while Landsberger went to the trailer. She reiterated her story that she only saw a fight and robbery at the recreation area which occurred after the visits to the trailer. She also maintained that she only used the victim's phone to listen to music and to call a friend until the battery died. She expressed the robbery was not premeditated before the victim entered the car; she also said she was not aware Landsberger planned to hurt the victim. Some texts were then read to her to dispute this. She thereafter admitted texting from the victim's phone.

**{¶27}** When asked about the text telling Landsberger he may "have to knock him out in here," she claimed "in here" referred to the car at the recreation area, not while they were at the trailer; she denied being in the bedroom or present when Landsberger killed the victim, claiming he was alive when they brought her home some time before 3:00 a.m. She remembered her text about the crowbar, noting the plan was to beat up the victim. Upon being asked why she texted Landsberger to say the night did not go as planned, she replied, "I didn't expect him to beat the living shit out of the guy." After it was pointed out that she suggested the crowbar, she responded, "I'm thinking knock him out. Not beat 'em till he's almost dead." She said Landsberger was supposed to "conk 'em in the head

a couple times and grab his stuff an we were gonna go." She estimated it was two degrees outside that night.

{¶28} On November 18, 2015, Appellant was indicted on seven counts: (1) murder (for purposely causing the death of another by aiding and abetting Landsberger); (2) tampering with evidence (for deleting evidence from the victim's phone), a third degree felony; (3) conspiracy to commit robbery (for inflicting, attempting to inflict, or threatening physical harm while committing, attempting, or fleeing a theft offense), a third degree felony; (4) complicity to the same robbery (by aiding and abetting Landsberger), a second degree felony; and (5-7) obstructing justice (corresponding to the three police interviews), third degree felonies due to the type of offense being investigated.

{¶29} The case was tried to a jury over the course of five days. A stipulated polygraph examination, administered in September 2016, was admitted into evidence along with the examiner's testimony. Appellant's answers to the following four pre-disclosed questions indicated deception: "Did you see Quinn murdered?" (answer: "No"); "Were you in the bedroom when Quinn was murdered? (answer: "No"); "Was Quinn alive the last time you saw him? (answer: "Yes"); and "Were you in the trailer when Quinn was beaten to death? (answer: "No"). (Tr. 977-978).

{¶30} In addition to all of the evidence reviewed above, the state presented the testimony of a witness who testified the victim was one of her drug dealers. She said he was not a typical dealer as he was caring and was not violent even when he was owed money. (Tr. 422). Although the victim was generous, she said he would not lend out his phone. (Tr. 444). She bought crack from the victim on the afternoon of March 5, 2015, hours before his death. She thereafter went to her uncle's residence where she saw Appellant. Appellant indicated she would see the victim that night to repay a favor she owed him. (Tr. 430-432). This witness learned the victim was dead the next day.

{¶31} The defense called Appellant's neighbor as a witness. Appellant lived with her parents; she helped at the neighbor's business and grew up with the neighbor's children. The neighbor testified she was awake doing paperwork on the night of March 5 turning into March 6, 2015. (Tr. 1060-1061). She saw a dark SUV pull in Appellant's driveway "sometime after 1:30, two o'clock." (Tr. 1063). She said she used binoculars and watched Appellant get out of the vehicle. (A detective testified the distance between

the houses was 350 yards; and a map showed the neighbor's house was located much further back from the road than Appellant's residence). The neighbor said she heard two car doors shut, but the driver's door stayed closed (apparently suggesting a second passenger changed places after Appellant left the car). (Tr. 1065). The neighbor admitted telling the police a year after the incident that this probably occurred closer to 3:30 a.m., but she pointed out she told them she would check her records. (Tr. 1079).

{¶32} The jury found Appellant guilty of all charges. The court sentenced Appellant to: 15 years to life for murder; 12 months for tampering with evidence; 6 years for robbery; and 12 months on each of the three counts of obstructing justice. The conspiracy to commit robbery count was merged with the robbery count prior to sentencing. The court ordered the sentences to run consecutively for a total sentence of 25 years to life. Appellant filed a timely notice of appeal from the April 28, 2017 sentencing entry.

<u>ASSIGNMENT OF ERROR ONE: SUFFICIENCY FOR MURDER</u>

{¶33} Appellant sets forth six assignments of error, the first of which provides:

"Danielle Heckathorn's conviction for complicity to murder for the death of Quinn Wilson was supported by insufficient evidence * * * [citations omitted]."

{¶34} We begin by noting Appellant frames the sufficiency argument as the invocation of plain error. Alternatively, within the fourth assignment of error, Appellant contends counsel was ineffective to the extent counsel waived the issue by failing to move for acquittal on the murder count. On this topic, criminal defense attorneys regularly move for acquittal as a matter of custom, but the failure to so move does not necessarily render trial counsel's performance deficient. *State v. George*, 9th Dist. No. 17CA0034-M, 2018-Ohio-3930, ¶ 14. It has also been observed: "Failure to move for an acquittal under Crim.R. 29 is not ineffective assistance of counsel, where the evidence in the State's case demonstrates that reasonable minds can reach different conclusions as to whether the elements of the charged offense have been proved beyond a reasonable doubt, and that such a motion would have been fruitless." *State v. Stokes*, 2d Dist. No. 2016-CA-4, 2016-Ohio-7520, ¶ 17. In any event, the subject of sufficiency need not be considered under the framework of ineffective assistance of counsel.

<u>Case No. 17 CO 0011</u>

**{¶35}** Regardless of whether the defense files a motion, Crim.R. 29(A) requires the trial court to grant an acquittal on its own motion if the evidence is insufficient to support an offense. A defendant does not waive a sufficiency argument by failing to raise the argument below as a not guilty plea preserves sufficiency arguments for purposes of appeal. *State v. Jones*, 91 Ohio St.3d 335, 346, 744 N.E.2d 1163 (2001), citing *State v. Carter*, 64 Ohio St.3d 218, 223, 594 N.E.2d 595 (1992). "The prosecution must prove each and every element of the offense beyond a reasonable doubt." *Carter*, 64 Ohio St.3d at 223, citing *Jackson v. Virginia*, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979). Hence, a defendant is not required to move for acquittal in order to raise sufficiency of the evidence on appeal. *In re J.M.*, 7th Dist. No. 12 JE 3, 2012-Ohio-5283, ¶ 34.

**{¶36}** Whether the evidence is legally sufficient to sustain a conviction is a question of law dealing with adequacy. *State v. Thompkins*, 78 Ohio St.3d 380, 386, 678 N.E.2d 541 (1997). An evaluation of witness credibility is not involved in a sufficiency review as the question is whether the evidence is sufficient if believed. *State v. Yarbrough*, 95 Ohio St.3d 227, 2002-Ohio-2126, 767 N.E.2d 216, ¶ 79, 82; *State v. Murphy*, 91 Ohio St.3d 516, 543, 747 N.E.2d 765 (2001). *See also Thompkins*, 78 Ohio St.3d at 390 (Cook, J., concurring) (sufficiency involves the state's burden of production rather than its burden of persuasion).

**{¶37}** A conviction cannot be reversed on grounds of sufficiency unless the reviewing court determines, after viewing the evidence in the light most favorable to the prosecution, that no rational juror could have found the elements of the offense proven beyond a reasonable doubt. *State v. Goff*, 82 Ohio St.3d 123, 1998-Ohio-369, 694 N.E.2d 916 (1998). *See also State v. Getsy*, 84 Ohio St.3d 180, 193, 702 N.E.2d 866 (1998) (the question is merely whether *any* rational mind could find the elements were established). The evidence and all rational inferences are evaluated in the state's favor. *See, e.g., State v. Filiaggi*, 86 Ohio St.3d 230, 247, 714 N.E.2d 867 (1999). Circumstantial evidence inherently possesses the same probative value as direct evidence. *State v. Treesh*, 90 Ohio St.3d 460, 485, 739 N.E.2d 749 (2001).

**{¶38}** Appellant was convicted of complicity to murder in violation of R.C. 2903.02(A), which entails purposely causing the death of another. At trial, Appellant

conceded she was complicit in the robbery. Appellant notes she was not charged with complicity to "felony murder" under R.C. 2903.02(B), which entails causing the death of another as a proximate result of the offender's committing or attempting to commit a first or second degree felony offense of violence (unless that offense was manslaughter). Appellant suggests the state relied on the mental state of knowingly or recklessly rather than the required mental state of purposely, quoting R.C. 2901.22(B) and (C) which provide: "A person acts knowingly, regardless of purpose, when the person is aware that the person's conduct will probably cause a certain result or will probably be of a certain nature"; and "A person acts recklessly when, with heedless indifference to the consequences, the person disregards a substantial and unjustifiable risk that the person's conduct is likely to cause a certain result or is likely to be of a certain nature."

{¶39} "A person acts purposely when it is the person's specific intention to cause a certain result * * *." R.C. 2901.22(A). A person who is complicit in the commission of an offense "shall be prosecuted and punished as if he were a principal offender." R.C. 2923.03(F) (and a complicity charge can be stated in terms of this statute or in terms of the principal offense). This complicity statute provides: "No person, acting with the kind of culpability required for the commission of an offense, shall * * * Aid or abet another in committing the offense * * *." R.C. 2923.03(A)(2). This requires an evaluation of whether the relevant acts aided or abetted the principal in committing the offense and whether the complicitor had the required intent.

{¶40} The surrounding facts and circumstances can be used to determine a defendant's intent. *State v. Johnson*, 93 Ohio St.3d 240, 245, 754 N.E.2d 796 (2001); *Treesh*, 90 Ohio St.3d at 485. "Participation in criminal intent may be inferred from presence, companionship and conduct before and after the offense is committed." *Johnson*, 93 Ohio St.3d at 245. Acts which aided or abetted another include those which "supported, assisted, encouraged, cooperated with, advised, or incited the principal in the commission of the crime * * *." *Id.*

{¶41} Purpose to cause death may be inferred from the use of a deadly weapon to inflict a wound calculated to destroy life. *State v. Stallings*, 89 Ohio St.3d 280, 291, 731 N.E.2d 159 (2000). The element of specific intent to cause death can be satisfied "where the natural and probable consequence of the wrongful act done is to produce

Case No. 17 CO 0011

death." *In re A.J.S.*, 120 Ohio St.3d 185, 2008-Ohio-5307, 897 N.E.2d 629, ¶ 52-53 (2008). *See also State v. Garner*, 74 Ohio St.3d 49, 1995-Ohio-168, 656 N.E.2d 623 (1995) (where aggravated murder requires evidence beyond a reasonable doubt that it was the specific intent of the defendant to have caused the death of another, evidence he set fire to a house with sleeping children was sufficient of intent as their deaths were natural and probable consequences regardless of the defendant's claim he thought they would awaken and flee); *State v. Reddy*, 192 Ohio App.3d 108, 2010-Ohio-5759, 948 N.E.2d 454, ¶ 37 (8th Dist.) (where the defendant admitted he intentionally pressed his hands around his mother's neck but only with intent to render her unconscious, there was specific intent to cause death as this is a natural and probable consequence of strangulation).

**{¶42}** "Based on the surrounding circumstances, which include the vulnerability of the victim and the force with which the victim was struck, a blow to the head may be probative of intent to kill." *State v. Clay*, 10th Dist. No. 99AP-404 (Mar. 28, 2000). Purposely instructing another to use a heavy metal tool, such as a crowbar, multiple times on a robbery victim's head is indicative of specific intent to cause death. *See, e.g., State v. Cook*, 1st Dist. No. C-960252 (Dec. 19, 1997) (bringing stonemason's hammer to robbery); *State v. Edwards*, 26 Ohio App.3d 199, 200, 499 N.E.2d 352 (10th Dist.1985) (hitting victim in head one time with a bannister railing). We also note Landsberger was 6'2" and estimated to weigh 250 to 280 pounds, and the victim was 5'6" (and his corpse weighed 170 pounds). (Tr. 289, 1004). The act of robbing a victim who knows the thief is also a consideration in ascertaining the purpose behind an assault during a robbery, and Appellant knew the victim and had his phone prior to the assault. *See, e.g., Cook*, 1st Dist. No. C-960252.

**{¶43}** Appellant challenges whether the following crowbar text should be used in the sufficiency of the evidence analysis on aiding or abetting: "U got a crow bar? Knock him out and drag him out of carLa." This text was saved as a draft on her phone, and she suggests it could not have encouraged Landsberger because there was no evidence it was sent. However, Appellant said she was texting Landsberger while they were in the car together with the victim. A person can show the person next to them a text they typed without sending it (rather than orally expressing an incriminating plan in a third person's

presence). In addition, in the context of the conversation about why she encouraged Landsberger's actions, she admitted she remembered the crowbar text. When asked why she asked if he had a crowbar, she answered: "To beat [him]. I don't know. I'd never been in that situation before."

{¶44} Furthermore, the authorities were unable to recover all texts from Appellant's phone due to bad memory sectors. Other incriminating texts were recovered and clearly sent. For instance, Appellant sent a text at 1:27 a.m. from the victim's phone suggesting Landsberger "knock him out in here." She told police she figured Landsberger could hit the victim a few times in the face and he would be "out" and disclosed that the plan did not flow as originally planned. She also said their plan was for Landsberger to "conk" him on the head a few of times. The use of this term, along with mention of knocking him out, suggests the plan involved the use of a hefty object to repeatedly hit the victim's head. The *admitted* plan after "conking" the victim on the head multiple times in order to "knock him out" was to leave him unconscious without his phone in a rural area in weather hovering near zero degrees.

{¶45} Notably, the fact Appellant admitted to this part of the plan does not mean this was the full plan and/or that plans did not evolve as the night progressed. In speaking of the totality of the circumstances used to determine purpose to cause a death, it is often stated: "The intent of an accused person dwells in his mind. Not being ascertainable by the exercise of any or all of the senses, it can never be proved by the direct testimony of a third person, and it need not be." *In re Washington*, 81 Ohio St.3d 337, 340, 691 N.E.2d 285 (1998). Contrary to Appellant's contention, the fact that some indicators of her expressed intent were recovered in the form of text messages does not mean the fact-finder can no longer consider the totality of the circumstances. In other words, the trier of fact is not limited by the intent specifically expressed in what could be recovered, especially where some texts were not recovered and the extent and content of live conversations were unknown. Circumstantial evidence inherently possesses the same probative value as direct evidence. *Treesh*, 90 Ohio St.3d at 485.

{¶46} Appellant encouraged Landsberger to rob the victim before the victim was picked up; she provided reasons to Landsberger by denigrating the victim (on grounds of race, intellect, and morality), gave advice on timing, and spoke of location. At the same

time, she encouraged the victim to bring a large variety of drugs under the guise of assisting him in establishing a drug trade in Lisbon. Before the three met up that night, Landsberger asked if Appellant wanted the victim beat up; he also asked if she wanted to "make it fri thirteen" and spoke of "hate sex." Appellant's answers were not recovered during the data extraction. They had phone and live conversations as well.

{¶47} After the victim was picked up, Appellant put him at ease by engaging in sex with him twice. Appellant and Landsberger were high on drugs. She was present while instructing Landsberger to knock the victim out as can be seen in the language "in here" in the text: "I dnt know u may have to do knock him out in here." Notably, she already had the victim's phone at this point as she used the victim's phone to send this text to Landsberger. The crowbar draft reveals *her* intent (even if we were to assume for the sake of argument that it was never communicated). And, the draft text "Jkill" saved to the victim's phone after Appellant commandeered his phone can be considered as part of the totality of the circumstances as well. Appellant admitted she intended to be present during the infliction of multiple head injuries and was present when Landsberger "beat the shit out of" the victim.

{¶48} The evidence indicated the victim was chopped in the face and head multiple times with a sharp hatchet-like object. Blood spatter and cast off was found in Landsberger's bedroom with an empty bed frame and the mattress and box springs in the fire pit. Appellant admitted they drove to Landsberger's residence with the victim two times that night. Although admittedly planning to rob and assault him, she had sex with the victim both times; the first time in Landsberger's bedroom where they tried to include Landsberger whom she said could not perform. She claimed the second time they went to Landsberger's residence, only Landsberger entered the trailer and she stayed in the car and had sex with the victim again. Merely because she told police her texts to Landsberger with instructions were occurring while they were at a recreation area does not require the jury to believe her claim; nor was the jury required to believe that she was not present at Landsberger's trailer when the victim was killed (whether a fight at the

Case No. 17 CO 0011

recreation area occurred or not). The jury was not bound by what Appellant claimed happened or what Appellant claimed was her intent in the interview played at trial.[1]

**{¶49}** As for her conduct subsequent to the incident, she asked what Landsberger did with the victim. Landsberger responded that the victim was at his trailer, the victim "stinks," the bed needed cleaned, and he did not know what to do with the victim yet. She thereafter mentioned having a conscience. She continued to communicate with Landsberger about bringing her drugs. They also spoke about deleting information. Appellant deleted messages from the victim's phone, and messages were deleted from her phone. Appellant was also not forthcoming with information during her interviews and provided false information.

**{¶50}** Viewing all the evidence and rational inferences in the light most favorable to the state, some rational juror could find Appellant purposely aided or abetted Landsberger in purposely causing the victim's death and thereby committed murder by complicity. Appellant's first assignment of error is overruled as there was sufficient evidence to support the murder conviction. The corresponding portion of Appellant's fourth assignment of error alleging ineffective assistance of counsel is also overruled as the failure to move for an acquittal on the murder charge was not deficient performance or prejudicial.

### ASSIGNMENT OF ERROR TWO: SUFFICIENCY FOR OBSTRUCTING

**{¶51}** Appellant's second assignment of error contends:

"Danielle Heckathorn's convictions for obstructing justice were supported by insufficient evidence * * * [citations omitted]."

**{¶52}** Appellant was convicted of three counts of obstructing justice for statements made during each of the three interviews with police. For instance, she denied deleting messages from the victim's phone at the first and third interviews. At the second and third interviews, she claimed she only used it for music and to call a friend (later admitting she

---

[1] Credibility concerns the weight of the evidence. Besides observing her demeanor and other cues, the jury was able to utilize the stipulated polygraph results to ascertain her credibility during the interview. The results indicated deception on key questions, including whether the victim was alive when she last saw him, whether she saw the victim murdered, and whether she was in the trailer and in the bedroom when the victim was murdered. As Appellant points out, the results of a stipulated polygraph examination are "admissible in evidence in a criminal trial for purposes of corroboration or impeachment," but the examiner's testimony "does not tend to prove or disprove any element of the crime." *State v. Souel*, 53 Ohio St.2d 123, 372 N.E.2d 1318 (1978), syllabus.

used it to text). At the first interview, she denied being complicit in the robbery, but she admitted her complicity in a subsequent interview. She originally said Landsberger already had the victim with him when she joined them. She suggested she refused to speak to Landsberger after the incident, but texts later showed she continued communicating with him.

**{¶53}** At one point in the first interview, she said the condom would not have been from that night; she then said she had sex with both Landsberger and the victim that night. In the second interview, she said she did not have sex with Landsberger that night. Also in the second interview, she said she could not believe Landsberger assaulted the victim and stole from him. Yet, in the third interview, she admitted her involvement in a plan to knock out the victim and take the drugs, as other evidence confirmed. The state also points out Appellant claimed her texts about knocking the victim out occurred while they were at a recreation area (not at the trailer), and at all three interviews, she claimed the victim was alive and conscious when they dropped her off at home which was the last time she saw him.

**{¶54}** The statute defining the offense of obstructing justice provides in pertinent part: "No person, with purpose to hinder the discovery, apprehension, prosecution, conviction, or punishment of another for crime or to assist another to benefit from the commission of a crime * * * shall * * * Communicate false information to any person * * *." R.C. 2921.32(A)(5); (C)(4) (a third degree felony if the crime committed by the other person is murder or a felony of the first or second degree and the defendant knew or had reason to believe this was the crime committed). In contesting the obstruction of justice convictions, Appellant emphasizes the statute's use of the identifier "another" and claims the evidence was insufficient to show her communication of false information was for the purpose of hindering the discovery, apprehension, prosecution, conviction, or punishment of Landsberger as it showed only a purpose to hinder the investigation and prosecution of herself.

**{¶55}** Initially, the state notes the Supreme Court's syllabus in a case addressing the obstructing justice statute does not mention the element of "another" when stating: "The making of unsworn false oral statements to a law enforcement officer with the purpose to hinder the officer's investigation of a crime is punishable conduct within the

meaning of R.C. 2921.32(A)(5)." *State v. Bailey*, 71 Ohio St.3d 443, 644 N.E.2d 314 (1994), syllabus. However, the issue in that case was whether unsworn statements were punishable (due to case law on other statutes), not whether statements could be punishable under R.C. 2921.32(A)(5) if they did not hinder the investigation of another for a crime. *See id.* at 443-448. Furthermore, the Court concluded: "A trier of fact could reasonably conclude from the evidence that defendant's purpose in making the false communication to the law enforcement officers was to hinder the discovery or apprehension *of Marvin Woodfork*." (Emphasis added). *Id.* at 448. The case thus involved the defendant hindering the investigation of another.

**{¶56}** The plain language of the statute requires the defendant to communicate false information for the purpose of hindering "the discovery, apprehension, prosecution, conviction, or punishment *of another* for crime or to assist *another* to benefit from the commission of a crime. (Emphasis added). R.C. 2921.32(A)(5). *See also State v. Hopkins*, 1st Dist. No. C-810539 (May 12, 1982) (complaint fails to state a violation of R.C. 2921.32 where the alleged purpose was to hinder the discovery of himself, rather than someone else).

**{¶57}** We proceed to Appellant's argument that the evidence only showed she was protecting herself, not Landsberger, when she provided various false statements to the police. As aforementioned, purpose involves specific intent to cause a certain result. R.C. 2901.22(A) ("or, when the gist of the offense is a prohibition against conduct of a certain nature, regardless of what the offender intends to accomplish thereby, it is the offender's specific intention to engage in conduct of that nature.") Intent can be inferred from the totality of the circumstances including circumstantial evidence, which has the same probative value as direct evidence. *Treesh*, 90 Ohio St.3d at 485. Therefore, the intent behind false communications can be gathered from the evidence as a whole, including rational inferences. The question of whether the investigation was *actually* hindered can be considered under the totality of the circumstances analysis but is not a required element of obstructing justice in R.C. 2921.32(A)(5). *See City of Cuyahoga Falls v. Cox*, 9th Dist. No. 13644 (Jan. 25, 1989). *Compare* R.C. 2921.31.

**{¶58}** The state notes, at the time of the first two interviews, the police did not have the deleted data from Appellant's phone showing she set the evening in motion,

encouraged Landsberger to rob victim, and was the connection between Landsberger and the victim. The police did not even have a body at the first interview. During that interview Appellant pointed police to a recreation area which they searched twice; she maintained this was the location of the robbery and assault throughout the three interviews. Whether this story was true was a question for the jury; it was not a given fact because Appellant maintained it was so.

{¶59} Evidence showing intent to hinder the prosecution of Landsberger also includes Appellant's claim that Landsberger discontinued the "fight" with the victim and acted friendly and caring to the victim, even offering to bring him to the hospital after they found the drugs lost in the snow while they were trying to steal them by force. She said the victim did not appear "terminal" and suggested he may have died later of his injuries suffered in the fight, which in turn implied a lessened culpability for Landsberger. Moreover, at the second interview, she suggested Landsberger asked the victim if Appellant could use his phone since Appellant's phone had no service. Furthermore, although she thereafter admitted they were untrue, she made statements during the third interview that the robbery was not premeditated and there was no plan to hurt the victim. A rational person could conclude these false communications were provided with purpose to hinder the prosecution and conviction of both herself and Landsberger.

{¶60} Importantly, a person can have multiple purposes or purposely do one act in order to accomplish another act. A person can specifically intend to hinder an investigation of another for the additional purpose of hindering the investigation of herself and still have purpose to hinder the investigation of the other person. This is especially true in a case involving complicity where the investigations are linked. The fact that a person has an ulterior purpose to help oneself does not eliminate the specific intent to hinder the investigation of another.

{¶61} To conclude, the totality of the circumstances allowed some reasonable person to find Appellant specifically intended to hinder the investigation of Landsberger when she communicated false information. There was sufficient evidence to allow the case to proceed to a jury for evaluation of the elements and the weight of the evidence. In accordance, Appellant's second assignment of error is overruled. The corresponding portion of Appellant's fourth assignment of error raising ineffective assistance of counsel

is also without merit as the failure to move for acquittal on the obstructing justice charges was not deficient performance or prejudicial.

## ASSIGNMENT OF ERROR THREE: PHOTOGRAPHS

{¶62} Appellant's third assignment of error provides:

"Ms. Heckathorn was denied a fair trial and due process of law by the admission of highly prejudicial photographs at trial * * * [citations omitted]."

{¶63} Appellant challenges four photographs showing the victim's bisected body; as stated above, the victim's body was discovered in two parts. Appellant relies on Evid.R. 403(A), which provides relevant evidence is not admissible if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading of the jury.

{¶64} The admission of potentially prejudicial photographs is determined under a discretionary balancing test that requires exclusion only if the probative value of the photographs is substantially outweighed by the danger of unfair prejudice. *State v. Franklin*, 62 Ohio St.3d 118, 125, 580 N.E.2d 1 (1991). *See also State v. Slagle*, 65 Ohio St.3d 597, 601, 605 N.E.2d 916 (1992) (admissibility of photographs is left to the sound discretion of the trial court). We note it is only the danger of *unfair* prejudice that is considered. Furthermore, the mere fact that a photograph may have gruesome aspects does not render it inadmissible per se. *State v. Maurer*, 15 Ohio St.3d 239, 265, 473 N.E.2d 768 (1984). Even if a trial court abused its discretion in admitting prejudicial photographs, the case is not reversed unless substantial rights of the defendant are affected by the admission. *State v. Lundgren*, 73 Ohio St.3d 474, 486, 653 N.E.2d 304 (1995), citing Evid.R. 103 and Crim.R. 52(A).

{¶65} During the testimony of the forensic pathologist, seven photographs were utilized. (St. Ex. 99-105). Six showed the victim's head wounds after they were cleaned in the medical examiner's office. The contested photograph is State's Exhibit 100, a photograph of the victim's entire body on the examination table. The view is from the victim's right side and shows the head wounds on that side. As the photograph is of the entire body and the body had been severed in half at the waist, the inside of each half of the body is visible. At trial, defense counsel objected to all seven pre-autopsy

Case No. 17 CO 0011

photographs. (Tr. 1002). The trial court overruled the objection and admitted the photographs. (Tr. 1003).

**{¶66}** In this assignment of error, Appellant challenges the trial court's admission of State's Exhibit 100; in her fourth assignment of error on ineffective assistance of counsel, Appellant contends counsel should have specified a more particular objection to State's Exhibit 100, instead of merely including it in the objection related to the seven photographs introduced during the forensic pathologist's testimony. However, counsel's objection preserved the issue for appeal. Although the objection applied to each of the seven photographs presented during the pathologist's testimony, counsel's objection noted the death was undisputed, urged the probative value was minimal as this was a case of complicity, and alleged the photograph was more prejudicial than probative.

**{¶67}** On appeal, Appellant contends State's Exhibit 100 is highly prejudicial but only slightly probative on the cause of death, noting the head injuries were specifically depicted in closer photographs admitted as State's Exhibits 99 and 101-105. Appellant notes she was not charged with gross abuse of a corpse, which was an offense to which Landsberger pled guilty (along with murder and tampering with evidence). She argues the outrage and shock caused by State's Exhibit 100 resulted in reversible prejudice as she was not charged with abusing the body after death.

**{¶68}** The state counters that the lack of charges with respect to the body after death does not mean she may not have been involved in disposal of the body or that the condition of the body when discovered was not relevant and probative. As previously mentioned, acts after an offense are relevant to complicity and intent. The state points out State's Exhibit 100 merely shows the entire body prior to the medical examination which lends credibility to the practice and procedure in preparation for autopsy, provides perspective, and depicts information provided in testimony (including that of the forensic pathologist), urging this was an intellectual, rather than an emotional, endeavor. The state notes the body was a crime scene and the condition of the body explains various events and evidence.

**{¶69}** The uncontested depiction of the head wounds established the cause of death and the purpose of the assailant, and it illustrated testimony that the victim died within seconds to minutes, rather than surviving during a car ride to Appellant's house as

she claimed. Photographs illustrating the type of wounds suffered by the victim and those corroborating the testimony of the coroner have significant probative weight that can overcome potential prejudice. *State v. Moore*, 81 Ohio St.3d 22, 32, 689 N.E.2d 1 (1998). Where a defendant contends he was not the perpetrator, the state can still present evidence of purpose to cause death in the form of photographs showing the extent of the injuries. *State v. Jones*, 7th Dist. No. 12 MA 181, 2014-Ohio-5915, ¶ 85, citing, e.g., *Maurer*, 15 Ohio St.3d at 265 (the places where bullets entered and exited the body and the resulting wounds were probative of purpose to cause death).

**{¶70}** Appellant points out, however, the photographs of the bisected body do not show cause of death. Nevertheless, the inclusion of the entire body photograph illustrated the testimony of the forensic pathologist that the bisection of the body occurred after death. This expert testified there was no hemorrhaging in the tissues around the bisection, and he explained there would be no spray of blood from this cutting which occurred after the heart stopped pumping. (Tr. 1006, 1025).

**{¶71}** This was relevant to other testimony regarding the blood spatter and cast-off evidence in the bedroom, which supported the theory that the victim was killed in the bedroom of Landsberger's trailer rather than at the recreation area. As the photograph supported expert testimony on a key subject, the probative value was high. *See State v. Craig*, 110 Ohio St.3d 306, 2006-Ohio-4571, 853 N.E.2d 621, ¶ 94 ("Although gruesome, each of these photographs supported the medical examiner's testimony and provided an overall perspective of her wounds."). Although the photograph was gruesome, the trial court did not abuse its discretion in determining the probative value of the photograph was not substantially outweighed by the danger of unfair prejudice, and substantial rights were not compromised by the admission of this photograph.

**{¶72}** Appellant also contests three photographs taken at the scene when the body was recovered: State's Exhibit 84 is the top half of the body lying face down on a hill (with no depiction of the inside of the body); State's Exhibit 87 is the bottom half of the body at the top of the hill by the road (with no depiction of the inside of the body); and State's Exhibit 90 includes both halves of the body as seen from the top of the hill (so the inside of the bottom half of the body is visible). Counsel expressly voiced that he had no objection to these photographs at trial. (Tr. 523).

{¶73} Appellant thus raises plain error under her third assignment of error challenging the admission of photographs and ineffective assistance of counsel under her fourth assignment of error for the failure to object to the admission of these photographs. The state reviews the relevancy of photographs of the scene where a body was discovered and reiterates its position that the lack of a charge for abusing a corpse does not mean evidence of how the body was disposed is inadmissible in a case where the defendant was complicit in the murder, tampered with evidence, and obstructed justice.

{¶74} Ineffective assistance of counsel involves a demonstration of deficient performance by counsel, which involves performance falling below an objective standard of reasonable representation, and prejudice, which involves a reasonable probability that the result would have been different but for counsel's errors that deprived the defendant of a fair trial. *State v. Montgomery*, 148 Ohio St.3d 347, 2016-Ohio-5487, 71 N.E.3d 180, ¶ 82, citing *Strickland v. Washington*, 466 U.S. 668, 688, 694, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984). "Plain errors or defects affecting substantial rights may be noticed although they were not brought to the attention of the court." Crim.R. 52(B). An appellate court's invocation of plain error is discretionary. *State v. Rogers*, 143 Ohio St.3d 385, 2015-Ohio-2459, 38 N.E.3d 860, ¶ 23. "Notice of plain error under Crim.R. 52(B) is to be taken with the utmost caution, under exceptional circumstances and only to prevent a manifest miscarriage of justice." *State v. Landrum*, 53 Ohio St.3d 107, 111, 559 N.E.2d 710 (1990). To recognize plain error, the appellate court must find an obvious error which prejudiced the appellant by affecting his substantial rights; this involves a "reasonable probability that the error resulted in prejudice." *Rogers*, 143 Ohio St.3d 385 at ¶ 22 (equating this analysis of prejudice to the prejudice prong for an ineffective assistance of counsel analysis).

{¶75} In a murder prosecution, photographs of the scene where a victim's body was discovered are not inadmissible merely because they depict the condition of the body due to events occurring after death. *See, e.g., State v. Hutton*, 53 Ohio St.3d 36, 49, 559 N.E.2d 432 (1990) (repetitious photographs were "macabre" and depicted "extreme decomposition" of "a rotting corpse"); *State v. Goodwin*, 7th Dist. No. 99 CA 220, 2001-Ohio-3416 (where ear and skin were missing due to animals and decomposition). As the state points out, the location of the body and its condition when discovered were relevant to the testimony on how the body was discovered and when it may have been thrown

down the hill. The witness who discovered the body was prompted to look for signs of dumping after hearing a truck stop on a dirt road by the property the night before, which was after Landsberger's trailer was searched. The state makes note of the remoteness of the location and the proximity to Appellant's residence (1.7 miles).

{¶76} Additionally, the forensic pathologist stated scrapes on the victim's body could have occurred after death and did not necessarily occur prior to death (as suggested by Appellant's story about a fight at a recreation area). The landscape surrounding the body on the side of hill and the position of the body were pertinent in considering ways the scrapes may have occurred. Also relevant to this issue were the steepness of the hill and the fact the top half of the body was found a distance down the slope from the location of the bottom half. The unclothed state of the body was also relevant to the bag of bloody items, including clothing, found in Landsberger's shed. The victim's lack of clothing is also pertinent to Appellant's admission to having sex with the victim twice that night on Landsberger's property.

{¶77} The probative value of the depiction of the body at the scene of recovery was not substantially outweighed by the danger of unfair prejudice. In addition, substantial rights were not affected by the viewing of photographs to illustrate the testimony. The trial court did not commit plain error in admitting the three photographs from the scene of the recovery. Trial counsel was not deficient and did not otherwise render ineffective assistance by failing to object to the contested photographs. This assignment of error is overruled.

ASSIGNMENTS OF ERROR FOUR & FIVE:

INEFFECTIVE ASSISTANCE & CUMULATIVE ERROR

{¶78} Appellant's fourth and fifth assignments of error contend:

"Trial counsel provided ineffective assistance of counsel * * *" and "Ms. Heckathorn's rights to a fair trial and due process of law were violated by the cumulative errors that occurred during her trial [citations omitted]."

{¶79} The two-part test for ineffective assistance of counsel requires a defendant to demonstrate: (1) trial counsel's performance fell below an objective standard of reasonable representation; and (2) prejudice arose from the deficient performance. *State v. Bradley*, 42 Ohio St.3d 136, 141-143, 538 N.E.2d 373 (1989), citing *Strickland v.*

*Washington*, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984). Both prongs must be established; if the performance was not deficient, then there is no need to review for prejudice, and vice versa. *State v. Madrigal*, 87 Ohio St.3d 378, 389, 721 N.E.2d 52 (2000).

**{¶80}** In evaluating the alleged deficiency in performance, our review is highly deferential to trial counsel's decisions; there is a strong presumption counsel's conduct falls within the wide range of reasonable professional assistance. *Bradley*, 42 Ohio St.3d at 142-143, citing *Strickland*, 466 U.S. at 689. We are to refrain from second-guessing the strategic decisions of trial counsel. *State v. Carter*, 72 Ohio St.3d 545, 558, 651 N.E.2d 965 (1995). Instances of debatable trial strategy very rarely constitute ineffective assistance of counsel. *See State v. Thompson*, 33 Ohio St.3d 1, 10, 514 N.E.2d 407 (1987). There are "countless ways to provide effective assistance in any given case." *Bradley*, 42 Ohio St.3d at 142, citing *Strickland*, 466 U.S. at 689.

**{¶81}** To show prejudice, a defendant must prove his lawyer's errors were so serious that there is a reasonable probability the result of the proceedings would have been different. *Carter*, 72 Ohio St.3d at 558. Lesser tests of prejudice have been rejected: "It is not enough for the defendant to show that the errors had some conceivable effect on the outcome of the proceeding." *Bradley*, 42 Ohio St.3d at 142, fn. 1, quoting *Strickland*, 466 U.S. at 693. Prejudice from defective representation justifies reversal only where the results were unreliable or the proceeding fundamentally unfair due to the performance of trial counsel. *Carter*, 72 Ohio St.3d at 558, citing *Lockhart v. Fretwell*, 506 U.S. 364, 369, 113 S.Ct. 838, 122 L.Ed.2d 180 (1993).

**{¶82}** In her fourth assignment of error, Appellant sets forth five allegations of ineffective assistance of counsel: (1) counsel failed to object to State's Exhibits 84, 87, and 90, which were the photographs depicting the body at the recovery scene; (2) counsel objected to the photographs of the wounds taken at the medical examiner's office without focusing the court's attention on State's Exhibit 100, which showed the entire body, including the fact of bisection; (3) counsel failed to move for acquittal on the murder count; (4) counsel failed to move for acquittal on the counts of obstructing justice; and (5) counsel failed to object to testimony and closing argument about the distance of Appellant's residence from the site where the victim's body was discovered.

Case No. 17 CO 0011

{¶83} In her fifth assignment of error, Appellant claims that if this court finds each of these five allegations were errors which did not individually warrant reversal, then the court should consider whether the cumulative nature of the errors deprived her of a fair trial. Under the cumulative error doctrine, a conviction is reversible when the cumulative effect of errors in a trial deprived the defendant of a fair trial, even though each instance of trial court error did not individually warrant reversal. *State v. McKelton*, 148 Ohio St.3d 261, 2016-Ohio-5735, 70 N.E.3d 508, ¶ 321-322 (yet, errors do not become prejudicial by sheer weight of numbers).

{¶84} We addressed the first four allegations of ineffective assistance of counsel above within the corresponding first through third assignments of error. As for the fifth argument, a detective testified, without objection, that the body was discovered 1.7 miles from Appellant's residence, and it took him less than 4 minutes to drive this route. (Tr. 760). (He also testified the victim's body was discovered 8.8 miles from Landsberger's trailer, and it took him almost 14 minutes to drive this route.) In closing, the prosecutor noted the victim's body was found near Appellant's residence, not near Landsberger's residence. (Tr. 1182). Appellant now contends this evidence was not probative of a relevant matter because she was not charged with abuse of a corpse and the evidence created a great danger of unfair prejudice, confusion of the issues, and misleading of the jury, citing Evid.R. 403.

{¶85} The state points out Appellant encouraged Landsberger throughout the day and night of the murder. The evidence indicated he relied on her for direction. She was charged with complicity to murder and also accused of tampering and obstructing in the case. The lack of a charge for abusing a corpse does not preclude evidence of precisely where a victim's body was found. Likewise, it was not improper for the prosecutor to comment that the location was near Appellant's residence and not very close to Landsberger's residence, comparatively. This was a factual statement supported by the evidence and the inference drawn would constitute a fair comment. *See generally State v. Mundt*, 115 Ohio St.3d 22, 2007-Ohio-4836, 873 N.E.2d 828, ¶ 119. The failure to object to the testimony and comment in closing was not deficient performance; nor would the issue render the results unreliable or the proceeding fundamentally unfair.

Consequently, Appellant's fifth argument on ineffective assistance of counsel is without merit.

**{¶86}** We overruled the other four instances of ineffective of assistance of counsel supra. As set forth above, counsel sufficiently preserved the objection to the photograph of the victim's body prior to autopsy, but the objection was reasonably overruled. Also, the failure to object to the photographs of the body at the recovery scene did not constitute deficient performance as the photographs were admissible. Concerning Appellant's two claims on the failure to seek acquittal for murder and obstructing justice: the evidence is either sufficient or it is not. As concluded in the first and second assignments of error, the state presented sufficient evidence to support the contested elements of these offenses, and counsel was not deficient in choosing not to challenge sufficiency at trial.

**{¶87}** In conclusion, the five claims were not found to be harmless errors as they were not found to be errors at all. As there were not multiple instances of error, individually harmless, there was no cumulative error. *State v. Hunter*, 131 Ohio St.3d 67, 2011-Ohio-6524, 960 N.E.2d 955, ¶ 132 (in the absence of multiple errors, the cumulative error doctrine does not apply). Furthermore, there is no indication Appellant was deprived of a fair trial (even assuming arguendo counsel should have raised certain issues). Appellant's fourth and fifth assignments of error are overruled.

ASSIGNMENT OF ERROR SIX: CONSECUTIVE SENTENCING

**{¶88}** Appellant's sixth and final assignment of error provides:

"The trial court erred when it imposed consecutive sentences without expressly making the findings required by R.C. 2929.14 during the sentencing hearing * * * [citations omitted]."

**{¶89}** The court imposed the required sentence of 15 years to life for murder; 6 years for robbery (where the maximum was 8 years); and 12 months for each of the four third degree felonies (where the maximum was 36 months).[2] The court ran these counts consecutively for a total of 25 years to life.

**{¶90}** There is a statutory presumption in favor of concurrent sentences. *State v. Bonnell*, 140 Ohio St.3d 209, 2014-Ohio-3177, 16 N.E.3d 659, ¶ 23, citing R.C. 2929.41(A). When a trial court imposes consecutive sentences for multiple convictions,

---

[2] No sentence was entered for conspiracy to robbery as it was merged with complicity to robbery.

Case No. 17 CO 0011

it must make the required R.C. 2929.14(C)(4) findings at the sentencing hearing and incorporate those findings into the sentencing entry. *Id.* at ¶ 29, 37. Division (C)(4) of R.C. 2929.14 is considered to contain three separate required statutory findings: (1) consecutive service is necessary to protect the public from future crime or to punish the offender; (2) consecutive sentences are not disproportionate to the seriousness of the offender's conduct and to the danger posed to the public; and (3) one of the three alternative findings in subdivisions (a), (b), or (c). *State v. Beasley*, 153 Ohio St.3d 497, 2018-Ohio-493, 108 N.E.3d 1028, ¶ 252.

{¶91} To satisfy the third finding, one of the following three alternative findings must be made: (a) the offender committed one or more of the multiple offenses while awaiting trial or sentencing, was under a sanction imposed pursuant to R.C 2929.16, 2929.17, or 2929.18, or was under post-release control for a prior offense; (b) at least two of the multiple offenses were committed as part of one or more courses of conduct, and the harm caused by two or more of the multiple offenses so committed was so great or unusual that no single prison term for any of the offenses committed as part of any of the courses of conduct adequately reflects the seriousness of the offender's conduct; or (c) the offender's history of criminal conduct demonstrates consecutive sentences are necessary to protect the public from future crime by the offender. R.C. 2929.14(C)(4)(a)-(c).

{¶92} The trial court's sentencing entry contains no consecutive sentencing findings. The state concedes this and agrees the case must be remanded for a nunc pro tunc entry. Where the court properly makes consecutive sentence findings at the sentencing hearing, the absence of findings in the sentencing entry is considered a clerical error that can be corrected by the trial court in a nunc pro tunc entry to reflect what occurred at sentencing. *Bonnell*, 140 Ohio St.3d 209 at ¶ 30-31 (and fixing such a clerical error does not create a new final, appealable order).

{¶93} A nunc pro tunc entry cannot cure a failure to make the required findings at the sentence hearing. *Beasley*, 153 Ohio St.3d 497 at ¶ 260-261 (remanding as court could not discern trial court made required proportionality finding); *Bonnell*, 140 Ohio St.3d 209 at ¶ 30. Appellant concedes the trial court made the first two consecutive sentence findings but contends the court failed to adequately set forth the third finding,

Case No. 17 CO 0011

i.e., one of the three alternatives in division (C)(4)(a)-(c). The state argues the trial court made sufficient consecutive sentence findings at the sentencing hearing, urging the court adequately set forth the third finding under subdivision (b) of R.C. 2929.14(C)(4). The state urges the trial court essentially found the harm caused by the offenses was so great or unusual that no single prison term would adequately reflect the seriousness of the conduct.

{¶94} At sentencing, the court spoke of the purposes and principles of sentencing and noted the goals to protect the public, punish offenders, and decree a fair sentence. The court announced it had analyzed the seriousness and recidivism factors and disclosed it was adopting the analysis of those factors set forth in the state's sentencing memorandum. (Sent.Tr. 30). The court then found:

> The evidence shows that this Defendant was the architect or the mastermind of the robbery and murder of Quinn Wilson. The public needs to be protected from her for a very long time.
>
> I agree with the State's observation in its Sentencing Memorandum that the evidence established that the Defendant was responsible for setting into motion all the events that led to the brutal slaughter of Quinn Wilson.
>
> The disposition of the various counts in this case reflect either the sentence required by law or what is necessary in the Court's opinion to carry out the purposes and principles of the Sentencing Law, which I just detailed. Most particularly to protect the public. Anything less than the sentences which are about to be handed down and the consecutive nature of them that this Defendant is being given would fail to protect the public.
>
> Further, the consecutive nature of any sentence given is not disproportionate to the very serious nature of the criminal conduct involved, which involved great, tragic, and fatal harm to the late Quinn Wilson.

(Sent.Tr. 30-32).

{¶95} The court announced that it was imposing consecutive sentences on each offense instead of adopting the state's recommendation. (Sent.Tr. 32-33). The state recommended higher sentences on the non-murder counts. For the second degree felony of robbery, the state asked for 7 years. For the four third degree felonies, the state

asked for the maximum sentence of 3 years, concurrent to each other but consecutive to the murder and robbery on which the state also sought consecutive sentences. When added to the sentence of 15 years to life for murder, the total recommended sentence was 25 to life, which was the same total sentence imposed by the court. In explaining why the court chose to impose consecutive sentences on all offenses instead of adopting the state's recommendation, the court made additional pertinent findings: "I intentionally sentenced this Defendant with regard to the Tampering with Evidence and each of the counts of Obstructing Justice because she did everything within her power to thwart the efforts of our responsible law enforcement community to solve this brutal murder and robbery. She lied, she lied, and she lied, and she destroyed evidence." (Sent.Tr. 32-33).

**{¶96}** In evaluating the imposition of consecutive sentences, "a word-for-word recitation of the language of the statute is not required, and as long as the reviewing court can discern that the trial court engaged in the correct analysis and can determine that the record contains evidence to support the findings, consecutive sentences should be upheld." *Bonnell*, 140 Ohio St.3d 209 at ¶ 29. In other words, the court is not required "to give a talismanic incantation of the words of the statute, provided that the necessary findings can be found in the record * * *." *Id.* at ¶ 37. The question is whether we can "glean from the record" that the trial court made the third consecutive sentence finding at the sentencing hearing. *See id.* at ¶ 36.

**{¶97}** In *Bonnell*, the Supreme Court concluded that it could be discerned from the trial court's statement that the defendant showed "very little respect for society and the rules of society" that it found a need to protect the public from future crime or to punish the defendant to satisfy the first finding. *Id.* at ¶ 33. The Court also concluded the trial court's statement the defendant had an "atrocious" record allowed one to discern the court believed the defendant's history of criminal conduct demonstrated the need for consecutive sentences to protect the public from future crime to satisfy one of the alternative third findings. *Id.* (but the Court was unable to discern there was an evaluation of the second finding).

**{¶98}** Related to the finding in subdivision (b) of R.C. 2929.14(C)(4), the trial court implicated multiple offenses as being committed as part of one or more courses of conduct when it referred to Appellant as the mastermind and architect of the robbery and

murder and to her affirmative acts toward ("everything within her power to thwart") law enforcement resulting in the tampering and obstructing charges. The court spoke of the necessity for consecutive sentences and thereafter referenced the "very serious nature" of the conduct in conjunction with a description of the "great * * * harm" involved. Considering the totality of the trial court's statements at the sentencing hearing, we can discern from the record that the trial court engaged in the analysis required under R.C. 2929.14(C)(4)(b). However, as set forth above, the case must be remanded for a nunc pro tunc entry due to the absence of written consecutive sentence findings.

{¶99} For the following reasons, Appellant's convictions are affirmed, and the case must be remanded for the issuance of a nunc pro tunc sentencing entry with instructions to incorporate the consecutive sentencing findings made at the sentencing hearing in the entry.

Waite, P.J., concurs.

D'Apolito, J., concurs.

———————————————

For the reasons stated in the Opinion rendered herein, the assignments of error are sustained and it is the final judgment and order of this Court that the judgment of the Court of Common Pleas of Columbiana County, Ohio, is affirmed. We hereby remand this matter to the trial court to issue a nunc pro tunc sentencing entry incorporating the consecutive sentence findings made at the sentencing hearing according to law and consistent with this Court's Opinion. Costs waived.

A certified copy of this opinion and judgment entry shall constitute the mandate in this case pursuant to Rule 27 of the Rules of Appellate Procedure. It is ordered that a certified copy be sent by the clerk to the trial court to carry this judgment into execution.

## NOTICE TO COUNSEL

**This document constitutes a final judgment entry.**