[Cite as *State v. Hymes*, 2021-Ohio-3439.]

# IN THE COURT OF APPEALS OF OHIO

## SEVENTH APPELLATE DISTRICT
## MAHONING COUNTY

STATE OF OHIO,

Plaintiff-Appellee,

v.

JASON HYMES,

Defendant-Appellant.

---

**OPINION AND JUDGMENT ENTRY**
Case No. 19 MA 0130

---

Criminal  Appeal from the
Court of Common Pleas of Mahoning County, Ohio
Case No. 19 CR 157

**BEFORE:**
Carol Ann Robb, Gene Donofrio, Cheryl L. Waite, Judges.

---

**JUDGMENT:**
Affirmed.

---

*Atty. Paul J. Gains,* Mahoning County Prosecutor, *Atty. Ralph M. Rivera,* Assistant Chief, Criminal Division, Mahoning County Prosecutor's Office, 21 West Boardman Street, 6th Floor, Youngstown, Ohio  44503, for Plaintiff-Appellee and

*Atty. Louis DeFabio,* 4822 Market Street, Suite 220, Youngstown, Ohio 44512 for Defendant-Appellant.

Dated:  September 23, 2021

_____

**Robb, J.**

{¶1}    Defendant-Appellant Jason Hymes Sr. appeals his conviction entered in the Mahoning County Common Pleas Court after a jury found him guilty of murder, felonious assault, and two offenses which were merged with these counts.  He sets forth arguments on:  the admissibility of other acts evidence; sufficiency and weight of the evidence on the element of purpose for the murder charge in count one; prosecutorial misconduct in closing arguments; the denial of a mistrial after a spectator's outburst during closing arguments; and whether the court should have merged felonious assault with murder.  For the following reasons, Appellant's convictions are affirmed.

<u>STATEMENT OF THE CASE</u>

{¶2}    On February 13, 2019, Ryan Weaver Hymes (the victim) went to a bar with her husband (Appellant) in Youngstown.   A video obtained from the bar's outdoor surveillance system showed Appellant's lengthy assault on the victim in the parking lot.  Appellant's truck was parked directly in front of the door of the bar with the rear of the vehicle facing the door; the bar's camera was pointed at the passenger side.  The victim exited the bar and got in the passenger side of the truck.  Appellant then exited the bar and got in the driver's seat.  After several seconds, the truck rocked from side to side.

{¶3}    The victim kicked her door open in an attempt to exit.  Appellant can be seen on the passenger side facing the victim.  He reached his left hand out in an attempt to close the door, but hit the victim's foot with the door and ripped the interior panel off the door.  He lifted the victim's legs and pressed her body into the seat; her foot was lifted all the way to the top of the door frame.  He again tried to close the door from the passenger side while facing the back of the truck.

{¶4}    At this point, the victim exited the vehicle from the back door; this placed her in a position between the two doors as the back door was hinged at the rear.  Appellant grabbed the victim and forcefully pressed her backward into the truck by her hair.  He then picked her legs up and shoved her into the front seat.  She attempted to latch her feet onto the edge of the truck.

<u>Case No. 19 MA 0130</u>

**{¶5}** The victim was able to step out of the vehicle again, but Appellant pushed her back by the face multiple times. Appellant's brother approached and tried to hold Appellant back while Appellant continued pressing the victim's legs into the vehicle. Appellant seemed to pause as his brother talked to him.

**{¶6}** When the victim stepped out of the truck again, Appellant roughly grabbed her and seemed to hit her face as he pressed her against the open door. Appellant's brother again attempted to intervene, but Appellant knocked the victim to the ground, grabbed her by the hair and by the circular scarf around her neck, and began pulling her around. Another bystander intervened as the victim struggled to pull the scarf over her head.

**{¶7}** Appellant punched his way out of the truck as the men attempted to push him into it. He maintained his grip on the victim's hair and brought the victim to the ground while seemingly hitting her in the face. He threatened to hit his brother while the bystander seemed to scold him and the victim sat on the ground holding her nose. After the victim stood up, Appellant pushed her hard causing her to fly backwards onto the passenger seat. She exited the vehicle again.

**{¶8}** Appellant then can be clearly seen punching the victim hard in the face as she was pinned against the open door. He picked her up and threw her in the air toward the passenger area, causing her head/face to slam into the truck's door frame. He retrieved her from the ground and shoved her into the front seat, repeatedly slamming down her legs, which were in the air.

**{¶9}** Appellant continued to press the victim into the vehicle. When she stopped resisting, he tried to get the broken passenger door to close. A third bystander ran to the scene from across the street. Appellant appeared to threaten to fight his brother while the second bystander intervened. The victim then exited the truck and held a napkin to her nose. She approached Appellant and walked with him toward the driver's side of the truck. He then pushed her toward the vehicle, and she entered the truck through the driver's door followed by Appellant. She shut the passenger door, and they immediately drove away (approximately six minutes after his rampage began).

**{¶10}** In addition to the surveillance video, the state presented the testimony of Appellant's brother. He testified he exited the bar to calm Appellant. He described the argument he witnessed as "somewhat physical." He claimed he did not see Appellant hit

the victim, but he also said he was struck by Appellant in the mouth during his attempts to intervene. (Tr. 257-258). Appellant's brother phoned his wife so she could accompany him to the hospital as to have his tooth and bleeding lip evaluated. (Tr. 258-259).

{¶11} The victim's twelve-year-old daughter, who called Appellant "dad" her entire life, was present when Appellant returned to their house in Youngstown after the bar incident. She described his demeanor as "mad" and "panicking." He told her to stay at the house and said he would return shortly. (Tr. 310).

{¶12} Appellant returned with the victim who appeared hurt: her face and eyes were red; she was limping; and she was speaking in a low tone. (Tr. 311-312). Appellant descended to the basement with the victim. The child heard "breaking, and boom, boom * * * a lot of noise." (Tr. 312). Both were yelling at the same time with Appellant telling the victim, "You need to stop having a smart mouth" while the victim screamed, "stop, Jason, stop." (Tr. 313). The child was scared.

{¶13} When the victim ascended from the basement, she appeared "Hurt more, like then she had a little more bruises on her." The child told the victim she was departing for a cousin's house across the street. (Tr. 314). Before she left, the child witnessed Appellant punch the victim in the face. (Tr. 320). The child ran across the street in a panic and called 911 at 10:20 p.m. and again at 10:36 p.m. (Tr. 315-316, 333, 500); (St.Ex. 2). She very quietly reported her dad was beating her mom.

{¶14} Officers were dispatched to the residence for a report of a fight; they conducted a welfare check and left. (Tr. 512-513). The child stayed at the cousin's house that night. Before going to sleep, the child called Appellant's phone and spoke to her mother, asking her to go to the hospital. The victim said she was fine and was going to sleep. (Tr. 316). Appellant told the child, "you don't call the police on me. Tomorrow I'm taking that phone." (Tr. 317).

{¶15} As it approached midnight, Appellant's brother arrived home from his emergency room visit and received a call from Appellant, who insisted he come over for some issue related to the victim. (Tr. 261, 280). Appellant's brother and his wife arrived to find Appellant in the kitchen while the victim was on her back on the floor in the child's bedroom. Appellant's brother said it seemed as if the victim was having a seizure as she was shaking, her eyes were open (but not really looking at him), and she was

Case No. 19 MA 0130

unresponsive. (Tr. 263). Appellant reported the victim had no history of seizures. (Tr. 507).

{¶16} Appellant's sister-in-law testified Appellant appeared very nervous and scared when they arrived at his house. He told them: he was arguing with the victim in the kitchen; she said she was leaving and was going to get her clothes; she ran into the child's room; and he heard a noise like someone fell. (Tr. 266, 283-284). Appellant's sister-in-law called 911 at 12:08 a.m. (on February 14, 2019), reporting the victim and her husband had been fighting and the victim was unconscious. (Tr. 264, 500). Before the ambulance arrived, Appellant said, "Sis, they gonna take me to jail." (Tr. 284).

{¶17} The victim was still unconscious when she arrived at the emergency room. CAT scans showed bilateral acute subdural hematoma (blood clots on both sides of her brain). (Tr. 423, 456). The bleeding compressed the brain restricting blood flow. (Tr. 457). A neurosurgeon arrived at the hospital and found the victim comatose with minimal brain function. Her recovery chances were "very, very small," but the family wanted everything done, the trauma was recent, and she was young; so, the neurosurgeon performed surgery to remove the clots along with a craniectomy (bone removal from the sides of the skull) to relieve swelling. (Tr. 424, 426). He opined the victim's condition was caused by "a lot of trauma" and not by a simple slip-and-fall from a standing height, noting the clots were large and on both sides of the head. (Tr. 428-429).

{¶18} After a few hours at the hospital, Appellant visited the victim's sister to tell her about the victim's condition. He was shaking as he reported the victim was "messed up" and "something bad happened." (Tr. 240). The victim's sister testified her husband grabbed Appellant and Appellant insisted he "never touched her" (while Appellant's brother agreed). (Tr. 241).

{¶19} After the victim arrived at the hospital, the police began investigating Appellant for felonious assault on the victim. They took photographs of her in the hospital bed (while a nurse pointed out various injuries). (Tr. 342). They found the victim's blood on a bloody napkin in the driveway behind Appellant's truck. (Tr. 409-410). There were additional bloody napkins and spots of her blood in the truck. (Tr. 353-354, 360, 411). The victim's blood was also on Appellant's shirt. (Tr. 413).

{¶20} Appellant told the police the same story he told his brother and sister-in-law and denied hitting the victim that night. When confronted with the blood evidence, he

said he may have "threw an elbow at her" and initiated "a bearhug to get her back in the truck because she was trying to get out." When the detective mentioned the bar may have a video surveillance system, Appellant admitted to striking the victim twice at the bar. He denied being aware the victim was bleeding but later suggested she may have been bleeding at their home. (Tr. 490). He continued to deny hitting the victim while they were at home that night. (Tr. 492).

{¶21} The victim's already minimal brain function quickly deteriorated, and the breathing machine was stopped with the family's consent. (Tr. 427-428). She died on February 15, 2019. That same day, Appellant was recorded during a jail call saying the video from the bar "needed to come up missing." (Tr. 506). The victim's sister testified Appellant later said he was sorry while asking to see the victim's child. (Tr. 244). The victim's child testified Appellant called her, said he "didn't mean to do it," and apologized. (Tr. 319).

{¶22} The forensic pathologist concluded the cause of death was blunt force trauma (from blunt force injuries) to the head with the manner of death being a homicide. (Tr. 470). He viewed the video, noticing the head impacts, and read the police reports. (Tr. 446-447). He said the vast majority of bilateral acute subdural hematomas are caused by head injury; theoretically, bleeding on both sides could be caused by one impact if it was severe enough. (Tr. 460-461, 472). An x-ray showed the victim also suffered fractured nasal bones. (Tr. 451). The forensic pathologist identified photographs showing bruises on the victim's: bottom lip, around both eyes, behind both ears, on the front and back of her thighs and lower legs, and on both arms. She had abrasions on her leg, wrist, and arms. (Tr. 452-455).

{¶23} At trial, the detective testified to Appellant's statements and pointed out parts of the assault seen in the video, including the following acts by Appellant: dragging the victim on the ground by her scarf; punching her "hard" twice in the head; and causing a bloody nose (which the victim cleaned with a napkin). (Tr. 508, 516, 520-521). The state's closing argument additionally pointed to the part of the video showing Appellant slamming the victim's head against the door frame of the truck.

{¶24} The jury found Appellant guilty of the four counts in the indictment: (1) murder for purposely causing the death; (2) murder for causing the death as the proximate result of committing a felony of violence of the first or second degree; (3) felonious assault

for knowingly causing serious physical harm (a second-degree felony); and (4) domestic violence for knowingly causing or attempting to cause physical harm to a family or household member (a fourth-degree felony due to a prior conviction, which was the subject of a defense stipulation).

{¶25} The state elected to proceed to sentencing on the murder in count one rather than the murder in count two which would merge; the state also agreed the domestic violence count should be merged into the felonious assault count. The state argued the remaining murder and the felonious assault would not merge as they were committed separately at two different locations and were offenses of dissimilar import as the victim suffered separate and identifiable harm. (Sent.Tr. 5-8). The court agreed and found support for the alternate theory of separate animus. (Sent.Tr. 19-22).

{¶26} The court sentenced Appellant to fifteen years to life for murder (with purpose) and eight years for felonious assault to run consecutively. Appellant filed a timely notice of appeal from the October 28, 2019 sentencing entry.

## ASSIGNMENT OF ERROR ONE: OTHER ACTS

{¶27} Appellant sets forth five assignments of error on appeal. His first assignment of error contends:

"The trial court erred in permitting the State to introduce other acts evidence."

{¶28} The state filed a notice of intent to use evidence with a motion in limine asking the court to admit evidence of Appellant's prior violent history with the victim. The motion said the evidence demonstrated absence of mistake or accident and was relevant to his identity as the cause of death (as opposed to a fall causing the death). In arguing the motion before trial, the state emphasized Appellant's claim to the police that the victim's death was caused by a slip and fall and urged his history of violence toward the victim was relevant to show the lack of accident or mistake and to show his conduct was purposeful. (Tr. 188-189, 196-197). The defense argued the other acts evidence could not be considered unless the defense opened the door by presenting Appellant's testimony and argued the evidence was unfairly prejudicial. (Tr. 187, 194).

{¶29} The trial court ruled the defendant's claim of accident did not have to be elicited from the stand in order for the other acts evidence to be admitted and found the evidence could be admitted to show lack of accident or mistake as to how the victim died.

Case No. 19 MA 0130

(Tr. 194-195). Defense counsel asked the court to note a continuing objection to the evidence, and the court said it would. (Tr. 200).

**{¶30}** Still, the court indicated the matter would be further judged during trial. The decision was a preliminary ruling before the actual presentation of the evidence during the trial testimony where it could be adjudged in context upon proper objection. The preliminary issue presented in a motion in limine must be renewed at trial when the evidence is actually presented or the argument made therein is waived for purposes of appeal. *State v. Hill*, 75 Ohio St.3d 195, 202-203, 661 N.E.2d 1068 (1996).

**{¶31}** On appeal, Appellant claims the court improperly allowed the state to present other acts evidence to demonstrate his propensity for assaulting his wife and to show he acted in conformity with his character. He says the state used the evidence to paint a picture that it was only a matter of time before he killed his wife. He contests the following testimony on other acts.

**{¶32}** Appellant's sister-in-law was asked about the relationship between Appellant and the victim. She said it was sometimes loving but they would argue and fight, answering in the affirmative when asked if the relationship ever got physical. (Tr. 278). There was no objection entered. If a timely objection was lacking, then the appellant must not only show an error occurred and the error was obvious, but he must also show it affected the outcome of the trial. *State v. Graham*, __ Ohio St.3d __, 2020-Ohio-6700 at ¶ 93 (finding error in admitting other acts evidence but refusing to find plain error as the error did not affect the outcome of trial), citing *State v. Barnes*, 94 Ohio St.3d 21, 27, 759 N.E.2d 1240 (2002). The general, non-specific testimony of Appellant's sister-in-law would not have affected Appellant's substantial rights under the circumstances of this case. The real focus is on the other acts testimony of the victim's sister, the victim's child, and on statements Appellant made to the detective.

**{¶33}** The victim's sister testified she first realized Appellant was abusive when she looked out her door and saw the victim "fly across the street, like her body." She did not see the actual physical motion by which Appellant caused this to occur, but she yelled at him not to put his hands on her sister and he apologized. (Tr. 231-232). Another time, she intervened when Appellant was "dragging [the victim] up and down the street." (Tr. 231-232). In the past, she observed the victim with injuries such as a broken nose, teeth, and fingers. (Tr. 232). Over objection, the victim's sister testified: the victim told her

Appellant caused these injuries; the victim told the hospital staff she was injured in a fall; and the staff said the victim's body could not take much more. (Tr. 232-233, 236).

**{¶34}** The victim's child testified: she asked Appellant if he would stop hitting her mother months before the victim's death; he said he would; and the situation got worse. (Tr. 307-308). She stated she witnessed Appellant's prior acts of punching, hitting, throwing, and kicking the victim; she associated the behavior as occurring after Appellant drank liquor. (Tr. 304). The child said he would threaten the victim by stating: "I'm gonna hurt you if you don't stop talking." (Tr. 306). The child mentioned calling her step-brother on the night at issue because "his mom went through it, so obviously I think he would know what to do" (not necessarily referring to Appellant). (Tr. 314). There were no objections during these portions of the child's testimony.

**{¶35}** The detective testified he asked Appellant about past violence in the relationship. Over objection, the detective said Appellant "initially downplayed it, but ultimately admitted to having some physical altercations" with the victim in the past. (Tr. 491). Appellant said one such altercation resulted in "a cut over her eye" which occurred when he "grabbed her and she slipped and fell and hit her eye"; Appellant also acknowledged the victim "has lied for him in the past when they have gone to the hospital." (Tr. 491-492).[1]

**{¶36}** "Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show action in conformity therewith. It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident." Evid.R. 404(B). "Thus, while evidence showing the defendant's character or propensity to commit crimes or acts is forbidden, evidence of other acts is admissible when the evidence is probative of a separate, nonpropensity-based issue. *State v. Hartman*, 161 Ohio St.3d 214, 2020-Ohio-4440, 161 N.E.3d 651, ¶ 22.

---

[1] Appellant complains the state's notice of intent to use evidence (which sought to introduce other acts by Appellant against the victim) mentioned the victim's sister and the victim's child as witnesses to prior incidents but did not mention the detective would be testifying about Appellant's statement about their past. However, Evid.R. 404(B) says the proponent of the evidence "shall provide reasonable notice in advance of trial, or during trial if the court excuses pretrial notice on good cause shown, of *the general nature* of any such evidence it intends to introduce at trial." (Emphasis added.) In addition, Appellant's statement was recorded and provided in discovery.

<u>Case No. 19 MA 0130</u>

**{¶37}** A trial court is precluded as a matter of law from admitting improper character evidence under Evid.R. 404(B) but has discretion to admit other acts evidence which has a permissible purpose. *State v. Graham*, __ Ohio St. 3d __, 2020-Ohio-6700, __ N.E.3d __, ¶ 72, citing *Hartman*, 161 Ohio St.3d 214 ("the admissibility of other-acts evidence pursuant to Evid.R. 404(B) is a question of law"), citing *State v. Williams*, 134 Ohio St.3d 521, 2012-Ohio-5695, 983 N.E.2d 1278, ¶ 17 (the rule bars evidence to prove character in order to demonstrate conforming conduct, but it gives the trial court discretion to admit other acts evidence for a permissible other purpose). The court employs:

> a three-part analysis for determining the admissibility of other-acts evidence: to be admissible, (1) the evidence must be relevant, Evid.R. 401, (2) the evidence cannot be presented to prove a person's character to show conduct in conformity therewith but must instead be presented for a legitimate other purpose, Evid.R. 404(B), and (3) the probative value of the evidence cannot be substantially outweighed by the danger of unfair prejudice, Evid.R. 403.

*Graham*, __ Ohio St. 3d __, 2020-Ohio-6700, __ at ¶ 72.

**{¶38}** In general, evidence is relevant if it tends "to make the existence of any fact that is of consequence to the determination * * * more probable or less probable than it would be without the evidence." Evid.R. 401. *See also Hartman*, 161 Ohio St.3d 214 at ¶ 24; Evid.R. 402 ("Evidence which is not relevant is not admissible."). The relevancy determination in this context asks "whether the evidence is relevant to the particular purpose for which it is offered" which must be one other than character or propensity. *Hartman*, 161 Ohio St.3d 214 at ¶ 26.

**{¶39}** Evid.R. 404(B) contains a "nonexhaustive list of the permissible nonpropensity purposes for which other-acts evidence may be introduced." *Id.* at ¶ 26. "The nonpropensity purpose for which the evidence is offered must go to a 'material' issue that is actually in dispute between the parties." *Id.* at ¶ 27. Also, evidence of similar acts "is relevant only if the jury can reasonably conclude that the act occurred and that the defendant was the actor." *Id.* at ¶ 28.

**{¶40}** If the evidence is not presented for character and has a permissible purpose under Evid.R. 404(B), then the trial court uses its discretion to determine whether the probative value "is substantially outweighed by the danger of unfair prejudice, of

confusion of the issues, or of misleading the jury." *Id.* at ¶ 29-30, citing Evid.R. 403(A). The probative value and the unfairness of any prejudice can depend on the degree to which the fact is truly in dispute and whether it can be shown with alternative evidence. *Id.* at ¶ 31-32.

**{¶41}** First, we address Appellant's claim there was no "substantial proof" he committed the other acts. *Hartman*, 161 Ohio St.3d 214 at ¶ 28. He notes the testimony was not corroborated with a police report or hospital record. "It is not essential to the admissibility of evidence regarding prior incidents that such incidents were either reported to police officials by the victim or resulted in a conviction." *State v. Jones*, 7th Dist. Mahoning No. 95 C.A. 98 (June 26, 1998) (admitting testimony on an incident where the defendant held his former wife hostage with a rifle ten years prior to the prosecution for the death of his current wife where the defendant claimed the shooting was accidental while they were fighting over a gun), citing *State v. Armstrong*, 74 Ohio App.3d 732, 600 N.E.2d 690 (2d Dist.1991).

**{¶42}** Here, the "jury can reasonably conclude that the act occurred and that the defendant was the actor." *See Hartman*, 161 Ohio St.3d 214 at ¶ 28. The jury could evaluate the credibility of the victim's sister and the victim's child who claimed to have witnessed certain acts. Moreover, the detective testified as to *Appellant's own admissions* about: prior physical arguments, the victim lying for him at the hospital in the past, and a specific incident where the victim ended up with a head wound and Appellant claimed she slipped and fell during a fight.

**{¶43}** Second, we address Appellant's argument that other acts evidence cannot be admitted for a use permitted by Evid.R. 404(B) unless *the defendant specifically introduced evidence at trial* on a defense related to a permissible use of other acts evidence. Appellant points out the non-propensity purpose for admitting the other acts evidence must relate to a material issue "actually in dispute." *See Hartman*, 161 Ohio St.3d 214 at ¶ 27. He complains the prosecution introduced the defendant's statement (that the victim was injured due to an accidental fall) and used this to assert a permissible use under Evid.R. 404(B) without waiting to see if he would be opening the door to the issue.

**{¶44}** As the trial court ruled at the motion in limine hearing, the permissible uses of other acts evidence in Evid.R. 404(B) do not only apply when a defendant takes the

stand or presents witnesses. *See generally State v. Hunter*, 131 Ohio St.3d 67, 2011-Ohio-6524, 960 N.E.2d 955, ¶ 20, 22, 30 (where the defendant told the police the child fell down the stairs and presented no guilt phase witnesses, the Court upheld the decision to admit evidence on prior incidents of injury to the child which the defendant had reported were a result of his falling while holding the child).[2] We note a defendant often does not present witnesses because the state's witnesses have the information relevant to defending the case, defendants rarely testify, and there is no formal notice a defendant must file disclosing every defense theory to the state. Also, the mere decision to forgo a lengthy opening statement does not bar the state from establishing there is an issue surrounding a permissible use of other acts evidence. The defendant's own pretrial statements can be used by the state to show the lack of mistake or accident is a material issue in the case. *See id.*

{¶45} Here, Appellant repeatedly claimed the victim was injured at home as a result of an accident where she fell in a bedroom while running (from him after a night of physical violence as captured on video and subsequently witnessed by the victim's twelve-year-old child). The state's first two witnesses (Appellant's brother and sister-in-law) testified to Appellant's claim at the scene while the victim was lying on the floor dying. After summoning them and instead of calling 911, Appellant told them the victim was injured when she slipped and fell while running into a bedroom (to pack and leave the house). Appellant also told this story to the police when he was interviewed on the day the victim was hospitalized, and the detective testified to Appellant's claim. Appellant also suggested to the detective he may have elbowed the victim in the face by mistake while putting her in "a bearhug." And, Appellant told the victim's sister he did not put his hands on the victim.

{¶46} Moreover, defense counsel asked the victim's child whether her mother got aggressive when she drank alcohol, eliciting a statement that the victim would sometimes

---

[2] In a murder case where the state was required to show an intentional homicide, the United States Supreme Court said evidence which eliminated the possibility of accident was probative of intent where the defendant claimed *before trial* the victim injured herself by falling, regardless of whether the defendant specified a defense of accidental death at trial. *Estelle v. McGuire*, 502 U.S. 62, 69, 112 S.Ct. 475, 116 L.Ed.2d 385 (1991) (noting the prosecution had the burden to prove every element of the crime). A defendant's claim of how an injury occurred to police and medical staff can reveal a possible defense of accident, allowing the state to introduce other acts evidence of his prior assault on the same victim. *People v. Wright*, 918 N.Y.S.2d 598, 601 (2011).

hit Appellant (but only if he hit her first). Defense counsel cross-examined the neurosurgeon on whether the brain trauma could have resulted from a fall, whether a seizure could cause damage to the brain, and whether the bouncing of a head on the floor during a seizure could cause problems. (Tr. 432). He also asked the forensic pathologist whether the trauma to the victim's brain could have occurred from just one impact. (Tr. 472). In closing arguments, defense counsel mentioned the testimony stating the victim appeared to be having a seizure. He also said the testimony showed the victim's injuries could have been sustained "by one fall" while noting she did not appear seriously injured after the punches that were witnessed. (Tr. 580-581). Counsel also urged there was no evidence showing Appellant had intent to purposely cause the death of his wife. (Tr. 581).

**{¶47}** Appellant next suggests the evidence was not material to the absence of mistake or accident exception. The state urges the absence of mistake or accident as to the cause of the victim's death and his purpose (intent) were material issues actually in dispute. The state points out to negate a defendant's claim of mistake or accident, the prosecution can use similar incidents to show the act in dispute was not inadvertent, accidental, involuntary, or lacking in guilty knowledge. *Hartman,* 161 Ohio St.3d 214 at ¶ 52. It is argued the case at bar implicates both categories discussed by *Hartman* in explaining the two main ways a defendant raises a claim of accident: (1) a statement disputing whether a criminal act occurred at all or (2) a statement disputing the act was committed with criminal intent. *Id.* at ¶ 52-53.

**{¶48}** For the first category, the Court provided an example of the state alleging a defendant killed his fourth wife by poison while the defendant claimed a certain natural cause, which would allow evidence showing his other wives died with nearly the same symptoms. *Id.* at ¶ 52. As to the second category, the Court provided the example of a husband who claimed he accidentally shot his wife while hunting, which would allow evidence he shot other wives under similar circumstances to show his intent in the most recent shooting. *Id.* at ¶ 53.

**{¶49}** These examples do not require the past incidents to be close in time to the current incident. This court has applied Ohio Supreme Court precedent allowing evidence of prior acts of domestic violence to show motive, intent, and absence of mistake or accident when the defendant later kills the victim. *State v. Ash,* 2018-Ohio-1139, 108

N.E.3d 1115, ¶ 67 (7th Dist.) (even an incident temporally removed from the incident in question can be admitted under an exception to show the tumultuous and strained relationship), citing *State v. Nields*, 93 Ohio St.3d 6, 10, 22, 752 N.E.2d 859 (2001). *See also Jones*, 7th Dist. No. 95 C.A. 98 (admissible other acts testimony on an incident with former wife ten years before the defendant's current wife was allegedly accidentally shot)

**{¶50}** In a death penalty case, the defendant said his child fell down the basement steps. The Supreme Court upheld the admission of testimony about two prior hospital visits where the defendant claimed the child was injured when the defendant fell while holding the child. *State v. Hunter*, 131 Ohio St.3d 67, 2011-Ohio-6524, 960 N.E.2d 955, ¶ 16-17, 109-111. "Such evidence was particularly relevant because it showed that [the defendant's] claim that [the child] died during an accidental fall was probably untrue. Based on this evidence, the panel could reasonably infer that [the defendant] acted purposefully in killing [the child]." *Id.* at ¶ 114.

**{¶51}** Here, the similar incidents involved the same victim. Appellant claimed no criminal act caused the victim's death as she died after slipping and falling. *See Hartman*, 161 Ohio St.3d 214 at ¶ 52. He also claimed some prior physical injuries that night were mistakenly or accidentally inflicted and certain blows to the victim's head did not cause her death or were not struck with purpose to cause her death. *See id.* at ¶ 53. Furthermore, when apologizing to the victim's child soon after the death, he generally claimed he "didn't mean to do it."

**{¶52}** Notably, *Hunter* involved the defendant's claim the victim died after suffering an accident by falling; the defendant's story as to how the child died did not involve a claim he accidentally injured the child. Similarly, the first qualifying example in *Hartman* involved a defendant's claim that something caused the victim's death naturally rather than a claim he accidentally caused it. This concept is on point as to Appellant's story of the victim's death (the victim fell when she was running away from him to pack clothes and leave him), and this story was similar to the story Appellant told the detective about the victim's past head injury (she received a cut above her eye during their fight when he grabbed her and she fell). It also supports the testimony of the victim's sister confirming Appellant's statement to the detective that the victim previously lied to cover for him by saying she fell. The contested testimony was not presented as character or propensity

Case No. 19 MA 0130

evidence but was relevant to an exception to the other acts exclusion which was in material dispute.

{¶53} Next, Appellant contends "the probative value [of the other acts evidence] is substantially outweighed by the danger of unfair prejudice, of confusion of the issues, or of misleading the jury" and was required to be excluded under Evid.R. 403(A). There was no indication the evidence would cause confusion or mislead the jury. The state points out the evidence was highly probative to show the victim's various injuries were not caused by a mistake or accident and the death was caused with specific intent. It was reasonable to find "under the circumstances, the detailed facts of the charged and uncharged offenses strongly suggest that an innocent explanation is implausible." *Hartman*, 161 Ohio St.3d 214 at ¶ 58 (to determine whether other acts evidence is genuinely probative of the intent of the accused to commit the charged crime, rather than merely the accused's propensity to commit similar crimes).

{¶54} This probative value must be outweighed by not just prejudice but by "unfair prejudice," and this outweighing must be *substantial*. Evid.R. 403(A). "All state's evidence is meant to be prejudicial." *State v. Rupp*, 7th Dist. Mahoning No. 05 MA 166, 2007-Ohio-1561, ¶ 67, citing *State v. Crotts*, 104 Ohio St.3d 432, 2004-Ohio-6550, 820 N.E.2d 302. Unfair prejudice is not evidenced by the harm caused to the defense by admissible evidence which had a high probative value but involves an invitation to rule based on invalid grounds. *State v. Lang*, 129 Ohio St.3d 512, 2011-Ohio-4215, 954 N.E.2d 596, ¶ 89.

{¶55} "Because fairness is subjective, the determination of whether evidence is unfairly prejudicial is left to the sound discretion of the trial court and will be overturned only if the discretion is abused." *State v. Crotts*, 104 Ohio St.3d 432, 2004-Ohio-6550, 820 N.E.2d 302, ¶ 25. The decision was within the trial court's discretion. *State v. Graham*, __ Ohio St. 3d __, 2020-Ohio-6700, __ N.E.3d __, ¶ 72. Notably, the jury heard strong evidence of Appellant's violence toward the victim on the night her demise began: the video showed Appellant striking the victim's head with his fist at least twice and causing her head to hit the truck, and later, the victim's child heard the victim begging Appellant to stop while banging emanated from their location in the basement and then witnessed him punch the victim in the face. Furthermore, as the trial court concluded, prejudice was lessened by the jury instruction. *Williams*, 134 Ohio St.3d 521 at ¶ 24

("This evidence is not unduly prejudicial, because the trial court instructed the jury that this evidence could not be considered to show [the defendant] had acted in conformity with a character trait. This instruction lessened the prejudicial effect").

**{¶56}** At the end of trial, the court instructed the jury: "Evidence was received about the commission of other acts other than the offenses with which the defendant is charged in this trial. That evidence was received only for the limited purpose. It was not received and you may not consider it to prove the character of the defendant in order to show that he acted in accordance with that character. If you find that the evidence of other acts is true and that the defendant committed them, you may consider that evidence only for the purpose of deciding whether it proves the absence of mistake." (Tr. 615-616). We presume the jury followed the limiting instruction stating the other acts evidence was not offered to prove the defendant's character. *Williams*, 134 Ohio St.3d 521 at ¶ 23.

**{¶57}** Appellant argues this instruction should have been tailored to a particular count. He states if the other acts evidence was admissible, then the jury should have been instructed they could only use it for the murder count. He claims he never said the assault at the bar was a mistake or an accident. However, when discussing the blood in his truck, he indicated to the detective he may have accidentally hit the victim with an elbow. He also commented he had her in a "bearhug" outside of the bar merely to get her back in the truck, which impliedly suggested he may have accidentally hurt her in the process, such as when he caused her head to hit the truck's door frame. Evidence that he bodily threw her in the past would be material to whether this incident was an accident. Furthermore, his repeated slip and fall claims could allow the prosecution to conclude he was suggesting the victim's main injuries were caused by her alleged fall.

**{¶58}** In any event, at the motion in limine hearing, the court asked *defense counsel* to draft the limiting instruction. (Tr. 198). And, there was no objection to the limiting instruction when the court gave the final jury instructions. "On appeal, a party may not assign as error the giving or the failure to give any instructions unless the party objects before the jury retires to consider its verdict, stating specifically the matter objected to and the grounds of the objection." Crim.R. 30(A).

**{¶59}** Finally, an "improper evidentiary admission under Evid.R. 404(B) may be deemed harmless error on review when, after the tainted evidence is removed, the remaining evidence is overwhelming." *State v. Tench*, 156 Ohio St.3d 85, 2018-Ohio-

5205, 123 N.E.3d 955 ¶ 177 (finding harmless error in capital case, where the state presented other acts evidence including evidence the defendant was a suspect in a prior robbery), quoting *State v. Morris*, 141 Ohio St.3d 399, 2014-Ohio-5052, 24 N.E.3d 1153, ¶ 32. Without any consideration of other acts evidence, the evidence of the offenses was overwhelming, including the independent incidents of felonious assault and the two types of murder. As to the element of purpose for the count one murder, the evidence is further discussed in the next assignment of error. In any event, the state properly introduced other acts against the same victim to show the death was caused with specific intent and not due to mistake or accident. This assignment of error is overruled.

### ASSIGNMENT OF ERROR TWO: PURPOSE

**{¶60}** Appellant's second assignment of error alleges:

"The jury's verdict of Guilty as to the Count I Murder charge was not supported by sufficient evidence and was against the manifest weight of the evidence."

**{¶61}** This assignment of error relates to the murder charge in count one with the elements of purposely causing the victim's death. R.C. 2903.02(A).[3] Appellant claims the state failed to present sufficient evidence of his purposeful intent. Alternatively, he contends the jury's decision on the element of purpose was against the manifest weight of the evidence.

**{¶62}** Whether the evidence is legally sufficient to sustain a conviction is a question of law dealing with adequacy. *State v. Thompkins*, 78 Ohio St.3d 380, 386, 678 N.E.2d 541 (1997). The standard for reviewing the sufficiency of the evidence to support a criminal conviction on appeal is the same as the standard used to review the denial of a motion for acquittal. *See State v. Williams*, 74 Ohio St.3d 569, 576, 660 N.E.2d 724 (1996); Crim.R. 29(A) (motion for judgment of acquittal based on insufficient evidence).

**{¶63}** In reviewing the sufficiency of the evidence, the court views the evidence in the light most favorable to the prosecution to ascertain whether any rational juror could have found the elements of the offense proven beyond a reasonable doubt. *State v. Goff*,

---

[3] We note even if Appellant's contention on purpose had merit, a remand would involve the activation or un-merging of the count two murder (proximately causing the death as a result of committing felony of violence of the first or second degree) which was merged with the count one murder and which could be viewed as dissimilar and separate from the felonious assault charge as there was more than one episode of felonious assault, as discussed in the final assignment of error (finding the felonious assault did not merge with the count one murder). The sentence of fifteen years to life applies to both types of murder in R.C. 2903.02. *See* R.C. 2909.02(B)(1).

82 Ohio St.3d 123, 138, 694 N.E.2d 916 (1998). The rational inferences to be drawn from the evidence are also evaluated in the light most favorable to the state. *See State v. Filiaggi*, 86 Ohio St.3d 230, 247, 714 N.E.2d 867 (1999).

**{¶64}** An evaluation of witness credibility is not involved in a sufficiency review as the question is whether the evidence is sufficient if it is believed. *State v. Yarbrough*, 95 Ohio St.3d 227, 2002-Ohio-2126, 767 N.E.2d 216, ¶ 79, 82; *State v. Murphy*, 91 Ohio St.3d 516, 543, 747 N.E.2d 765 (2001). In other words, sufficiency involves the state's burden of production rather than its burden of persuasion. *Thompkins*, 78 Ohio St.3d at 390 (Cook, J., concurring). If the court finds insufficient evidence to support a conviction, then a retrial is barred. *State v. Brewer*, 121 Ohio St.3d 202, 2009-Ohio-593, 903 N.E.2d 284, ¶ 16-20. Evidence presented by the state that was erroneously admitted by the trial court can be considered in the sufficiency evaluation because the remedy for the erroneous admission of prejudicial evidence is a new trial. *See id.*

**{¶65}** "A person acts purposely when it is the person's specific intention to cause a certain result, or, when the gist of the offense is a prohibition against conduct of a certain nature, regardless of what the offender intends to accomplish thereby, it is his specific intention to engage in conduct of that nature." R.C. 2901.22(A). The specific intent to cause death "may be presumed where the natural and probable consequence of the wrongful act done is to produce death." *In re A.J.S.*, 120 Ohio St.3d 185, 2008-Ohio-5307, 897 N.E.2d 629, ¶ 53. *See also State v. Reddy*, 192 Ohio App.3d 108, 2010-Ohio-5759, 948 N.E.2d 454, ¶ 37 (8th Dist.) (where the defendant claimed he pressed his hands around his mother's neck with intent to render her unconscious, there was sufficient evidence of a specific intent to cause death as this was a natural and probable consequence of his act).

**{¶66}** "Based on the surrounding circumstances, which include the vulnerability of the victim and the force with which the victim was struck, a blow to the head may be probative of intent to kill." *State v. Heckathorn*, 7th Dist. Columbiana No. 17 CO 0011, 2019-Ohio-1086, ¶ 42, quoting *State v. Clay*, 10th Dist. Franklin No. 99AP-404 (Mar. 28, 2000). A greater height, weight, and strength of the defendant compared to the victim is pertinent in evaluating purpose in inflicting blows to the victim. *Id.* at ¶ 42. *See also State v. Powell*, 75 Ohio Law Abs. 33, 142 N.E.2d 244 (7th Dist.1955) (considering the relative

size and strength of the parties, the manner of attack, and the wounds to determine whether the defendant intended to kill the victim).

**{¶67}** The detective pointed out the "big size difference" in height and weight between Appellant and the victim. (Tr. 520). Appellant's brother described the victim as petite and small while describing Appellant as tall and having a "nice build." (Tr. 255). Appellant's sister-in-law described the victim as "real tiny." (Tr. 277). Photographs of the victim were introduced, and the coroner's report showed she weighed 115 pounds. The video from the bar showed Appellant's size relative to the victim. At the bar, Appellant dragged her on the ground by a scarf around her neck, caused her head to slam against the truck's door frame, and hit her in the face at least twice; her broken nose bled in the truck after they left the bar. The victim was already injured and fragile when she arrived home after the felonious assault at the bar.

**{¶68}** Appellant entered the house apparently acting extremely agitated and left to retrieve the victim from an unknown location so he could assault her again. Appellant descended to the basement with the limping victim. The victim's child heard banging and booming from the basement while Appellant was yelling about stopping the victim's "smart mouth" and the victim was screaming for him to stop. The child was frightened and decided to leave the house. Appellant was clearly still experiencing the extreme anger witnessed by his brother in the bar's parking lot and depicted on the video. Before leaving her home, the child saw Appellant punch the victim in the face. She then ran across the street to a relative's house in a panic and called 911 twice. The police briefly investigated and left. The child called the victim, who said she was okay and did not need to go to the hospital.

**{¶69}** However, a rational juror could find by circumstantial evidence that the abuse was not over yet for the victim. Appellant indicated to the child over the phone he was upset about the 911 call. The victim indicated to the child she was okay and was going to sleep. Yet, Appellant's own statements to various witnesses suggested he was still fighting with the victim seconds before she ended up on the bedroom floor as he essentially said she threatened to pack her bags and leave the house, she ran from him, and he heard a big boom in the bedroom.

**{¶70}** The forensic pathologist opined the cause of death was blunt force "injuries" causing blunt force trauma to the head. (Tr. 470). Although a single severe enough

impact could theoretically cause the condition to the brain, he could not comment on the number of impacts here. (Tr. 472). He was viewing the victim's head only after the emergency surgery which included the removal of clots and the removal of bone from the sides of the skull to relieve pressure. As the neurosurgeon pointed out, the victim's head suffered a lot of trauma; the acute subdural hematoma occurred bilaterally (on both sides of her head), caused large clots, and was unlikely to have been caused by a fall from standing height. A rational juror could find Appellant concocted the story that the victim slipped and fell while running in an attempt to explain her final head injuries.

**{¶71}** As Appellant acknowledges, this court held a defendant's fists "become most deadly by blows often repeated, long continued, and applied to vital and delicate parts of the body of a defenseless, unresisting man on the ground." *Powell*, 142 N.E.2d at 247, quoting A.L.R., quoting *M'Whirt's Case*, 44 Va. 594 (1846). Furthermore, the Supreme Court has since ruled circumstantial evidence inherently possesses the same probative value as direct evidence. *State v. Trees*h, 90 Ohio St.3d 460, 485, 739 N.E.2d 749 (2001); *State v. Jenks*, 61 Ohio St.3d 259, 273, 574 N.E.2d 492 (1991) (overturning the rule that circumstantial evidence must be irreconcilable with any reasonable theory of innocence). *See also State v. Franklin*, 62 Ohio St.3d 118, 124, 580 N.E.2d 1 (1991) ("A conviction can be sustained based on circumstantial evidence alone.").

**{¶72}** This is especially relevant to the element of intent. Because a defendant's intent dwells in his mind, the surrounding facts, circumstances, and resulting inferences are the traditional indicators of a defendant's intent. *Treesh*, 90 Ohio St.3d at 485. In speaking of the totality of the circumstances used to determine purpose to cause a death, it is often stated: "The intent of an accused person dwells in his mind. Not being ascertainable by the exercise of any or all of the senses, it can never be proved by the direct testimony of a third person, and it need not be." *In re Washington*, 81 Ohio St.3d 337, 340, 691 N.E.2d 285 (1998).

**{¶73}** Appellant emphasizes the neurosurgeon's testimony about "the family" wanting him to do everything he could for the victim. He was not asked to identify who the family entailed, but as Appellant was the victim's husband, it could be presumed he was involved in the decision-making and this seemed to have occurred prior to the police arriving at the hospital. We note the neurosurgeon also told the family before surgery the chances of recovery were "very, very small." A person who wishes to deflect blame for

life-threatening injuries would wish to be publicly seen hoping for the victim's recovery. Also, a person who purposely kills his wife while in a rage throughout the night could be expected to regret his impulses thereafter for one reason or another and hope his wife can be saved.

**{¶74}** On the topic of Appellant claiming he wanted to do all he could to save the victim, it is remarkable that Appellant did not call 911 despite the victim's obviously critical condition. He called *his brother* instead and waited for him to arrive. Appellant was in the kitchen when his brother arrived while the victim was lying on the floor in the bedroom dying. His brother said the victim was shaking as if having a seizure, her eyes were open but she did not seem to be aware, and she was unresponsive. Appellant's sister-in-law happened to accompany her husband to Appellant's house (as she had just accompanied her husband to the hospital to be treated for the injury Appellant caused him). She took it upon herself to call 911 after viewing the victim's dire condition. Appellant told her "they gonna come take me to jail." After his arrest for felonious assault, he suggested someone should destroy the video evidence. He also later apologized to the victim's sister and child, claiming to the child that he "didn't mean to do it."

**{¶75}** For a sufficiency review, the question is merely whether "any" rational juror could have found the contested element satisfied beyond a reasonable doubt. *State v. Getsy*, 84 Ohio St.3d 180, 193, 702 N.E.2d 866 (1998), quoting *Jackson v. Virginia*, 443 U.S. 307, 319, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979). Viewing all of the evidence and rational inferences in the light most favorable to the prosecution, some rational juror could find that Appellant had the requisite mental state and purposely caused the victim's death by his continued purposeful assault on her head. Accordingly, his sufficiency argument is overruled.

**{¶76}** Weight of the evidence concerns "the inclination of the greater amount of credible evidence, offered in a trial, to support one side of the issue rather than the other." *Thompkins*, 78 Ohio St.3d at 387. Although the effect of the evidence in inducing belief is evaluated, weight of the evidence is not a question of mathematics. *Id.* A weight of the evidence review considers whether the state met its burden of persuasion. *See id.* at 390 (Cook, J., concurring) (as opposed to the burden of production involved in a sufficiency review).

**{¶77}** When a defendant claims the conviction is contrary to the manifest weight of the evidence, the appellate court is to review the entire record, weigh the evidence and all reasonable inferences, consider the credibility of witnesses, and determine whether, in resolving conflicts in the evidence, the trier of fact clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered. *State v. Lang*, 129 Ohio St.3d 512, 2011-Ohio-4215, 954 N.E.2d 596, ¶ 220, citing *Thompkins*, 78 Ohio St.3d at 387. "[T]he weight to be given the evidence and the credibility of the witnesses are primarily for the trier of the facts." *State v. Hunter*, 131 Ohio St.3d 67, 2011-Ohio-6524, 960 N.E.2d 955, ¶ 118, quoting *State v. DeHass*, 10 Ohio St.2d 230, 227 N.E.2d 212 (1967), paragraph one of the syllabus. The trier of fact occupies the best position from which to weigh the evidence and judge the witnesses' credibility by observing their gestures, voice inflections, and demeanor. *Seasons Coal Co. v. Cleveland*, 10 Ohio St.3d 77, 80, 461 N.E.2d 1273 (1984).

**{¶78}** Although only two of the three appellate judges on the panel must vote to reverse a conviction on the grounds of sufficiency of the evidence, the situation is different when a defendant asks for reversal of a jury verdict on weight of the evidence grounds. Where a case was tried by a jury, only a unanimous appellate court can reverse on manifest weight of the evidence grounds. *Thompkins*, 78 Ohio St.3d at 389, citing Ohio Constitution, Article IV, Section 3(B)(3). The power of the court of appeals to sit as the "thirteenth juror" is limited in order to preserve the jury's primary function of weighing the evidence. *Id*.

**{¶79}** Our review of the entire record does not indicate this is the exceptional case in which the evidence weighs heavily against the conviction and requires the exercise of our limited "thirteenth juror" discretion to grant a new trial. *See Lang*, 129 Ohio St.3d 512 at ¶ 220. Appellant's brother's testimony was enlightening but also appeared slanted in Appellant's favor. The video showed the initial assault and indicated Appellant's rage and the victim's condition. Appellant's failure to call 911 was revealing. The testimony of the victim's twelve-year-old child was highly credible. Appellant claims a mere three punches to the head would be unlikely to cause death; however, he is speaking of only the witnessed punches to the head (at two different locations) prior to victim's later loss of consciousness. A purposeful death does not require an eyewitness to be believable.

Appellant's claims about a slip and fall lacked credibility. We additionally incorporate our review of the evidence in our Statement of the Case and sufficiency analysis above.

**{¶80}** The evidence and inferences relied upon by the jury were not unbelievable. "When more than one competing interpretation of the evidence is available and the one chosen by the jury is not unbelievable, we do not choose which theory we believe is more credible and impose our view over that of the jury." *State v. Baker*, 7th Dist. Mahoning No. 19 MA 0080, 2020-Ohio-7023, ¶ 148, citing *State v. Gore*, 131 Ohio App.3d 197, 201, 722 N.E.2d 125 (7th Dist.1999). Appellant's conviction of murder by purposely causing the victim's death was not contrary to the manifest weigh of the evidence. Appellant's assignment of error is overruled.

ASSIGNMENT OF ERROR THREE: PROSECUTORIAL MISCONDUCT

**{¶81}** Appellant's third assignment of error provides:

"The Prosecutor engaged in prosecutorial misconduct during closing arguments, thus depriving Appellant of his right to a fair trial."

**{¶82}** When reviewing a claim of prosecutorial misconduct in closing arguments, the reviewing court evaluates whether remarks were improper and, if so, whether they prejudicially affected the defendant's substantial rights. *State v. Lott*, 51 Ohio St.3d 160, 165, 555 N.E.2d 293 (1990). The prosecution is afforded wide latitude in summation. *Id.* Contested statements made during closing arguments are not viewed in isolation but are read in context of the entire argument and the entire case. *State v. Treesh*, 90 Ohio St.3d 460, 466, 739 N.E.2d 749 (2001); *State v. Rahman*, 23 Ohio St.3d 146, 154, 492 N.E.2d 401 (1986) (also noting if the Court were to find "every remark made by counsel outside of the testimony were grounds for a reversal, comparatively few verdicts would stand, since in the ardor of advocacy, and in the excitement of trial, even the most experienced of counsel are occasionally carried away by this temptation").

**{¶83}** Appellant criticizes the state's rebuttal portion of closing arguments and notes there was no corrective instruction (just instructions before and after closing which explained closing arguments were not evidence.) However, there was no objection to the prosecutor's remarks and no request for a curative instruction. "A claim of prosecutorial misconduct is waived unless raised at trial, and if so waived, can serve as the basis for relief only if the conduct constitutes plain error." *State v. Franklin*, 97 Ohio St.3d 1, 2002-Ohio-5304, 776 N.E.2d 26, ¶ 24. Plain error is a discretionary doctrine to be used with

the utmost care by the appellate court in exceptional circumstances to avoid a manifest miscarriage of justice where an obvious error affected substantial rights, meaning it was outcome determinative. *State v. Noling*, 98 Ohio St.3d 44, 2002-Ohio-7044, 781 N.E.2d 88, ¶ 62, applying Crim.R. 52(B).

**{¶84}** First, Appellant says the prosecution denigrated defense counsel by describing counsel's reference to the lack of injuries to Appellant's hands as: "Smoke and mirrors, ladies and gentlemen. It's that witch in the window. They are trying to put doubt where there is no doubt." (Tr. 583-584).

**{¶85}** Appellant points out the prosecutor shall not denigrate or impute insincerity to defense counsel in the jury's presence. *See State v. Davis*, 116 Ohio St.3d 404, 2008-Ohio-2, 880 N.E.2d 31, ¶ 301 (but finding the improper comments did not result in plain error as they "did not pervade the closing argument, let alone the entire trial. Moreover, there is no reasonable basis to conclude that the result of the trial would have been different absent these improper comments"). Contrary to Appellant's contention, the prosecutor's "smoke and mirrors" remark is not akin to a case where the prosecutor made remarks unsubstantiated by the evidence and suggested defense counsel suborned perjury and the Supreme Court upheld the remand for a new trial. *See State v. Smith*, 14 Ohio St.3d 13, 14, 470 N.E.2d 883 (1984). Merely because the *Smith* case involved the word "smokescreen" did not make it similar. *See State v. Bedford*, 39 Ohio St.3d 122, 127, 529 N.E.2d 913 (1988) (finding no prejudice when prosecutor called the defense a "smokescreen" and called the defendant a "demon"). Also, *Smith* did not involve the plain error doctrine (nor did *Bedford* where the conviction was affirmed).

**{¶86}** Appellant also relies on a case finding it was improper for the prosecutor to say defense counsel had no defense to present and when "you have no defense you attack the police, you attack the prosecutor, you attack everybody. * * * You want to look at things that aren't important to this particular case, you want to deflect, you want to look for something that doesn't exist, you want smoke so he can't be seen." *State v. Getsy*, 84 Ohio St.3d 180, 194, 702 N.E.2d 866 (1998). However, the Court concluded the remarks "occurred only during closing argument and did not rise to the level of plain error." *Id. See also State v. Ahmed*, 103 Ohio St.3d 27, 2004-Ohio-4190, 813 N.E.2d 637, ¶ 126 (derogatory statements about defense trial tactics did not constitute plain error).

**{¶87}** Finally, in the contested comment on smoke and mirrors, the prosecutor was discussing the portion of defense counsel's closing argument claiming Appellant had no damage to his hands. Notably, there was no evidence that he suffered no injury; a photograph of Appellant at the police station was admitted, but his hands were facing to the sides. As the prosecutor pointed out, not every punch (or incident of grabbing to slam) must cause an injury to the hand of the assailant. Comments in the rebuttal portion of closing arguments in direct response to arguments advanced by opposing counsel are given more latitude. *State v. Miller*, 7th Dist. Mahoning No. 17 MA 0120, 2018-Ohio-5127, ¶ 25.

**{¶88}** Appellant also argues the prosecution improperly appealed to the jurors' sense of moral or civic duty rather than the evidence and law or made emotional arguments to inflame the jurors' sensibilities. He believes it was improper for the prosecutor to say he was raised to respect the principle that "under no circumstances do you put your hands on a woman." He also complains the prosecutor encouraged the jury to punish Appellant for lying to the police by stating: "while we are holding this defendant accountable for what he did to Ryan that night, let's also hold him accountable for the multiple times he lied to police in his interview * * *." (Tr. 587). Comments about the interview may have been supported by the record, but the phraseology about holding him accountable for lying was irregular since he was not charged with an offense containing that element.

**{¶89}** Finally, the prosecutor said: "it brings to mind a specific quote. And that is, the only thing necessary for the triumph of evil is for good people to do nothing. Ladies and gentlemen, this defendant is evil. What he did to Ryan is unadulterated, pure evil. So do something. Stop that evil." (Tr. 611). This started in the context of discussing items in the record: how Appellant's performance of certain acts in public allows them to infer what he could do in the privacy of their home and the observation that it was unfortunate no one saved the victim at the bar or when the police arrived at the house. Calling an act evil can be expected hyperbole in the ardor of the moment, but it has been said the prosecutor should not apply these types of derogatory terms to the defendant personally. *See State v. Liberatore*, 69 Ohio St.2d 583, 433 N.E.2d 561 (1982), fn. 9 (where the case was already being reversed for a new trial on unrelated grounds, the Court found extensive prosecutorial misconduct for many reasons, including the

prosecutor's characterization of the defendant "in derogatory terms clearly designed to inflame the jury").[4]

**{¶90}** Assuming the contested statements were improper, there was no plain error. Even when there is objection, "[n]ot every intemperate remark by counsel can be a basis for reversal." *State v. Landrum*, 53 Ohio St.3d 107, 112, 559 N.E.2d 710 (1990).[5] The question is the fairness of trial, not the culpability of the prosecutor. *Id.* Again, this was the rebuttal portion of closing argument, and no issue is taken with the initial closing argument presented by the state.

**{¶91}** Based on our review of the entire case, the contested remarks were not outcome determinative and did not deny Appellant a fair trial. *Accord State v. Lundgren*, 11th Dist. Lake No. 90-L-15-140 (Sept. 14, 1993) (no plain error where prosecutor paraphrased from the bible, "you have an opportunity to put this evil from the midst of us"), *aff'd* 73 Ohio St.3d 474, 488, 653 N.E.2d 304 (1995) (improper comment but no plain error in guilt phase of death penalty case); *State v. Jefferson*, 2d Dist. Montgomery No. 15828 (Mar. 14, 1997) (no reasonable probability outcome was affected by the prosecutor's characterization of the defendant as "an evil man" during closing argument); *State v. Smith*, 1st Dist. Hamilton No. C-860865 (Mar. 16, 1988) (even though the appellate court was already reversing on various other grounds, it found no plain error where the prosecutor called the defendant "evil," "vicious," "cruel," and a "piranha"), *rev'd on other grounds, State v. Smith*, 49 Ohio St.3d 137, 146, 551 N.E.2d 190 (1990) (upholding the convictions). As Appellant's substantial rights were not affected, there is no reason to consider exercising our discretion to recognize plain error. This assignment of error is overruled.

---

[4] *See also State v. Keenan*, 66 Ohio St.3d 402, 408, 613 N.E.2d 203, 208 (1993) (where the prosecutor said "That's a human being?" and then called the defendant an "animal," the Court said this type of "invective is not unfair per se" but added to the improper emotional appeal surrounding the prosecutor's entire argument in that case), citing *State v. Wiles*, 59 Ohio St.3d 71, 87, 571 N.E.2d 97 (1991) (where the prosecutor called the defendant "an ogre * * *, a man-eating monster, a hideous, brutish person * * * an animal," the Court said this "invective is highly unprofessional" but also said strong characterizations such as this have been allowed where there is support for them in the record).

[5] "Exercising restraint during closing arguments is frequently a part of a trial strategy involving a desire to avoid interruption and to avoid drawing attention to certain statements." *State v. Henderson*, 7th Dist. Mahoning No. 16 MA 0057, 2019-Ohio-1760, ¶ 11, citing *State v. Mundt*, 115 Ohio St.3d 22, 2007-Ohio-4836, 873 N.E.2d 828, ¶ 90, *State v. Franklin*, 97 Ohio St.3d 1, 2002-Ohio-5304, 776 N.E.2d 26, ¶ 42, and *State v. Clay*, 7th Dist. Mahoning No. 08MA2, 2009-Ohio-1204, ¶ 141. "Instances of debatable trial tactics generally do not constitute ineffective assistance of counsel." *Id.*, citing *State v. Lang*, 129 Ohio St.3d 512, 2011-Ohio-4215, 954 N.E.2d 596, ¶ 192.

ASSIGNMENT OF ERROR FOUR:  SPECTATOR COMMENT AT CLOSING

{¶92}  Appellant's fourth assignment of error alleges:

"The trial court erred and abused its discretion in failing to grant a mistrial based on a spectator's outburst during closing arguments."

{¶93}  During the rebuttal portion of the state's closing argument, the prosecutor re-played the video from the bar and was reviewing what the video depicted.  When pointing out the punches to the victim's head and the victim's head hitting the truck, an unidentified speaker said, "Why don't you come do that to me, punk?"  A deputy said, "Okay, stop. Stop. Enough."  The court reporter then typed, "there was an untranscribable outburst from the gallery."  Outside the presence of the jury, the court noted the spectator seemed to issue a threat to the defendant with words such as "I will get you."

{¶94}  Defense counsel asked for a mistrial.  The court said it would provide a cautionary instruction to the jury about the incident.  (Tr. 603-604).  Defense counsel indicated he would still object.  (Tr. 606).  The court then instructed the jury:  the disturbance was unacceptable and dealt with quickly by the deputies; the occupants of the courtroom were in no danger; and more deputies were added "to make sure that everyone has calmed down and that emotions are not going to cause a disturbance."  (Tr. 607).  The court reminded the jury their decision must be based on whether the state met its burden to prove beyond a reasonable doubt every element and not based on bias, sympathy, prejudice and emotion.  (Tr. 608).  The court continued, "what happened in here, in the courtroom, can in no way have any bearing on your decision in this case."  The jury was told to disregard the outburst, put it aside, and not let it affect the decision, reminding them the constitution requires the decision to be "based solely upon facts, not upon other outside influences or factors."  (Tr. 609).  Later, after the final jury instructions, counsel renewed his motion for a mistrial, which the trial court denied.  (Tr. 638-639).

{¶95}  Appellant contends the spectator's outburst denied him a fair trial by improperly influencing the jurors.  He claims the cautionary instruction was inadequate and may have inflamed the jury.  The state counters by pointing to the thoroughness of the curative instruction and noting Appellant's argument is speculative.

{¶96}  The decision on a mistrial motion lies within the sound discretion of the trial court and will not be reversed absent an abuse of discretion.  *State v. Treesh*, 90 Ohio St.3d 460, 480, 739 N.E.2d 749 (2001).  The mere existence of error or irregularity does

not warrant a mistrial. *Id.* "The granting of a mistrial is necessary only when a fair trial is no longer possible." *Id.*, citing *State v. Franklin*, 62 Ohio St.3d 118, 127, 580 N.E.2d 1 (1991) ("Mistrials need be declared only when the ends of justice so require and a fair trial is no longer possible."). We presume that the jury followed the court's instructions to disregard the outburst. *Id.*

{¶97} "When an emotional outburst takes place in court, the issue is whether the outburst 'deprived the defendant of a fair trial by improperly influencing the jury'." *State v. Trimble*, 122 Ohio St.3d 297, 2009-Ohio-2961, 911 N.E.2d 242, ¶ 126 (outbursts by spectators during gruesome photographs), quoting *State v. Scott*, 101 Ohio St.3d 31, 2004-Ohio-10, 800 N.E.2d 1133, ¶ 44. This "is a factual question to be resolved by the trial court, whose determination will not be overturned absent clear, affirmative evidence of error." *Id.*, quoting *State v. White*, 85 Ohio St.3d 433, 440, 709 N.E.2d 140 (1999), citing *State v. Morales*, 32 Ohio St.3d 252, 255, 513 N.E.2d 267 (1987). To reverse the trial court's exercise of discretion, there must be evidence "clearly and affirmatively appearing on the face of the record" showing the outburst improperly influenced the jury against the accused and deprived him of a fair trial. *Morales*, 32 Ohio St.3d at 255 (evaluating an "emotional demonstration in the courtroom during the course of a murder trial by a spectator related to the victim").

{¶98} The trial court did not abuse its discretion in providing the curative instruction and finding the defendant was not deprived of a fair trial by the spectator's outburst during the state's rebuttal portion of closing argument. There is no clear and affirmative showing to the contrary on the record. This assignment of error is overruled.

<u>ASSIGNMENT OF ERROR FIVE: MERGER</u>

{¶99} Appellant's fifth and final assignment of error contends:

"The trial court erred in violation of the Appellant's rights under the Double Jeopardy Clauses of the United States and Ohio Constitutions, R.C. 2941.25, when it failed to merge for sentencing purposes offenses that had a similar import, arose from the same conduct and were not committed separately."

{¶100} As aforementioned, the state elected sentencing on the murder in count one (purposely causing the death) rather than murder in count two (causing the death as the proximate result of committing a felony of violence of the first or second degree). The domestic violence count was merged with the felonious assault count. The state argued

the felonious assault count (knowingly causing serious physical harm) would not merge with murder as the relevant acts were committed separately at two different locations and were offenses of dissimilar import as the victim suffered separate and identifiable harm. (Sent.Tr. 5-8). The court agreed the felonious assault count would not merge with the murder count under these theories and also found support for the third theory of separate animus. (Sent.Tr. 19-22).

{¶101} R.C. 2941.25 codifies the constitutional double jeopardy protection against multiple punishments for the same offense. *In re A.G.*, 148 Ohio St.3d 118, 2016-Ohio-3306, 69 N.E.3d 646, ¶ 11; *State v. Ruff*, 143 Ohio St.3d 114, 2015-Ohio-995, 34 N.E.3d 892, ¶ 10, 12. This statute provides:

(A) Where the same conduct by defendant can be construed to constitute two or more allied offenses of similar import, the indictment or information may contain counts for all such offenses, but the defendant may be convicted of only one.

(B) Where the defendant's conduct constitutes two or more offenses of dissimilar import, or where his conduct results in two or more offenses of the same or similar kind committed separately or with a separate animus as to each, the indictment or information may contain counts for all such offenses, and the defendant may be convicted of all of them.

R.C. 2941.25.

{¶102} In evaluating whether allied offenses must be merged into a single conviction under R.C. 2941.25(A), the court "must first take into account the conduct of the defendant. In other words, how were the offenses committed?" *Ruff*, 143 Ohio St.3d 114 at ¶ 25. "At its heart, the allied-offense analysis is dependent upon the facts of a case because R.C. 2941.25 focuses on the defendant's conduct." *Id.* at ¶ 26. "Rather than compare the elements of two offenses to determine whether they are allied offenses of similar import, the analysis must focus on the defendant's conduct to determine whether one or more convictions may result, because an offense may be committed in a variety of ways and the offenses committed may have different import." *Id.* at ¶ 30.

Case No. 19 MA 0130

**{¶103}** There is no bright-line rule governing the comparison of two offenses, and thus, the analysis may "result in varying results for the same set of offenses in different cases." *Id.* at ¶ 30, 32.

> If any of the following is true, the offenses cannot merge and the defendant
> may be convicted and sentenced for multiple offenses: (1) the offenses are
> dissimilar in import or significance—in other words, each offense caused
> separate, identifiable harm, (2) the offenses were committed separately, or
> (3) the offenses were committed with separate animus or motivation.

*Id.* at ¶ 25. Stated differently, there are "three categories in which there can be multiple punishments: (1) offenses that are dissimilar in import, (2) offenses similar in import but committed separately, and (3) offenses similar in import but committed with separate animus." *Id.* at ¶ 20.

**{¶104}** Appellant argues felonious assault must be merged with murder because the state alleged a felonious assault resulted in the death. He says the felonious assault occurred when he inflicted blows to his wife and the events occurred continuously over a short period of time. He cites a case where an appellate court found felonious assault should have been merged with involuntary manslaughter (where the victim was stabbed four times "on the backside"). *State v. Anthony*, 2015-Ohio-2267, 37 N.E.3d 751, ¶ 48 (8th Dist.). The appellate court rejected the state's argument that the conduct could be differentiated into fatal and non-fatal stab wounds after noting there was nothing in the record to establish there were different types of wounds. *Id.* at ¶ 49. The court also found there was nothing in the record showing the offenses were committed separately or with separate animus and the court noted there were no details showing a break in the "temporal continuum" between the first and the final stab. *Id.* The case did not go to trial, and the court was confined to the plea and sentencing transcripts.

**{¶105}** However, the situation here is not similar. There was a trial here, and the trial record shows Appellant assaulted the victim two different witnessed times that night in two different locations and also when alone without witnesses. The night experienced by the victim did not involve one episode of felonious assault that resulted in her death. The specific facts determine whether merger is required, not the potential facts that could constitute the offenses in other cases. See *Ruff*, 143 Ohio St.3d 114 at ¶ 26, 30. In

reviewing the facts, the court gives deference to the jury's factual determinations and reviews the trial court's merger decision de novo. *State v. Williams*, 134 Ohio St.3d 482, 2012-Ohio-5699, 983 N.E.2d 1245, ¶ 26.

{¶106} As for the first category, the offenses are of dissimilar import or significance if "the defendant's conduct constitutes offenses involving separate victims or if the harm that results from each offense is separate and identifiable." *Ruff*, 143 Ohio St.3d 114 at ¶ 23, 26. The harm from each offense was separate and identifiable as: at the bar, Appellant dragged the victim on the ground by her scarf, hit her in the face causing a bloody nose, punched her again in the head, and caused her to hit her head on his truck while forcing her into the vehicle; after he drove to their home and they entered their house where the child spoke to them, he assaulted the victim in the basement and then punched her in the face while the child was watching just before 10:30 p.m.; and after the police stopped by the house (and before Appellant's sister-in-law called 911 near midnight), an argument occurred which caused the victim to run from Appellant and the victim ended up unconscious on the floor with Appellant claiming he heard a loud boom when the victim slipped and fell (her brain was bleeding on both sides, she never regained consciousness, and she died a day later).

{¶107} Additionally, applying the second category, there were discrete instances of conduct committed separately. There were details establishing a break in the "temporal continuum" between the first assault on the victim and the last. The assault at the bar and the assault at the home did not constitute one continuous act.

{¶108} As the trial court pointed out, there were also indicators of the alternate third category: separate animus or motivation. Appellant was upset with the victim at the bar. After she tried to exit the vehicle, part of his motive for injuring her was to try to force her into his vehicle in order to take her with him. Later, she did not enter the house with him; he appeared mad and panicking and left to retrieve her from an unknown location. They entered the house and went to the basement where he declared he was now upset with the victim because she would not stop her "smart mouth." The victim looked more injured when she ascended from the basement. The victim's child told the victim she was leaving, and Appellant punched the victim in the face. After the victim's child called 911, Appellant expressed anger the police were called on him, constituting yet another motivation for Appellant. Later, according to Appellant's own statements, the victim said

she was leaving him, she intended to pack and she ran from him. This would involve a new motivation related to how she ended up on the floor with bilateral acute subdural hematoma from blunt force trauma to the head.

{¶109} A finding of any one of the three categories allowed a conviction to be entered on the felonious assault rather than merging it with the murder. *Ruff*, 143 Ohio St.3d 114 at ¶ 25. All three existed here. Accordingly, the trial court did not err in refusing to merge the felonious assault with the murder. This assignment of error is overruled.

{¶110} For the foregoing reasons, the trial court's judgment is affirmed.


Donofrio, P J., concurs.

Waite, J., concurs.

———————————

For the reasons stated in the Opinion rendered herein, the assignments of error are overruled and it is the final judgment and order of this Court that the judgment of the Court of Common Pleas of Mahoning County, Ohio, is affirmed.  Costs waived.

A certified copy of this opinion and judgment entry shall constitute the mandate in this case pursuant to Rule 27 of the Rules of Appellate Procedure. It is ordered that a certified copy be sent by the clerk to the trial court to carry this judgment into execution.

## <u>NOTICE TO COUNSEL</u>

**This document constitutes a final judgment entry.**

<u>Case No. 19 MA 0130</u>